941 F.Supp. 945 (1996)
STATE OF MONTANA; Lake County, Montana, a political subdivision of the State of Montana; City of Ronan, Montana, a municipality of the State of Montana; and Town of Hot Springs, Montana, a municipal corporation, Plaintiffs,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, an agency of the United States; Carol Browner, Administrator of the United States Environmental Protection Agency; and the Confederated Salish and Kootenai Tribes, Defendants.
No. CV 95-56-M-CCL.
United States District Court, D. Montana, Missoula Division.
March 27, 1996.
*946 Joseph P. Mazurek, Attorney General for State of Montana, Harley R. Harris, Clay R. Smith, Office of the Montana Attorney General, Helena, MT, for Plaintiffs.
Sherry S. Matteucci, U.S. Attorney, District of Montana, Office of the U.S. Attorney, Billings, MT, Deanne L. Sandholm, Office of the U.S. Attorney, Helena, MT, David A. Carson, U.S. Department of Justice, Environmental Enforcement, Denver, CO, Lauren N. Soll, U.S. Department of Justice, Environment & Natural Resources, Washington, DC, for Defendant Environmental Protection Agency and Defendant Carol M. Browner.
Daniel F. Decker, Confederated Salish & Kootenai Tribes, Legal Department, Pablo, MT, for The Confederated Salish and Kootenai Tribes of the Flathead Nation.
Jon Metropoulos, Doney, Crowley, Bloomquist & Metropoulos, P.C., Helena, MT, for Flathead Joint Board of Control, Mission Irrigation District, Jocko Valley Irrigation District, Flathead Irrigation District, Ross Middlemist, Wayne W. Maughan, William Slack, Glenn Murphy.

OPINION AND ORDER
LOVELL, District Judge.
Before the court is a motion to intervene filed by the Flathead Joint Board of Control, the Mission Irrigation District, the Jocko Valley Irrigation District, the Flathead Irrigation District, Ross Middlemist, Wayne Maughan, William Slack, and Glenn Murphy. The Defendants oppose the motion, but Plaintiff consents to the intervention. Also before the court are cross motions for summary judgment.

1. Background.
In July, 1993, the Confederated Salish and Kootenai Tribes (the "Tribes") submitted a completed application for treatment-as-state ("TAS") status under section 303, 33 U.S.C. *947 § 1313, of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387 (1987 & 1995 Cum. Supp.), with respect to all surface waters within the Flathead Indian Reservation (the "Reservation"). The Environmental Protection Agency ("EPA") notified the State of Montana ("Montana") of the Tribes' application pursuant to 40 C.F.R. § 131.8(c)(2). Montana timely filed its comments regarding the application in accordance with 40 C.F.R. § 131.8(c)(3). Montana opposed the EPA granting the Tribes TAS status on the ground that the Tribes do not possess inherent civil regulatory authority over lands owned by nonmembers. Montana also contested factual assertions made by the Tribes in its application and requested an evidentiary hearing through which Montana could contest the Tribes' factual allegations. Because only Montana was considered an "appropriate governmental entity" entitled to make comments on the Tribes application, see 56 Fed.Reg. 64876, 64884 (December 12, 1991), the local government Plaintiffs and the proposed intervenors submitted their comments through Montana. All public comments were considered by the EPA before reaching its decision. See Decision Document, p. 7, AR # 27.
On February 27, 1995, the Director of EPA Region VIII approved the Tribes' application to establish water quality standards for surface waters within the Reservation under section 303 of the CWA. The EPA found that Montana did not rebut the presumption created by the Tribes' showing that pollution of surface waters traversing or appurtenant to nonmember land would have serious and substantial impact on the Tribes' health and welfare. On March 28, 1995, the Tribes adopted water quality standards for all surface waters on the Reservation.[1] The Tribe has submitted those standards to the EPA for approval in accordance with section 303(c) of the CWA.

2. Pleadings.
Plaintiffs filed their first amended complaint for declaratory and injunctive relief on June 8, 1995. Plaintiffs invoke the court's jurisdiction pursuant to the Administrative Procedures Act, 5 U.S.C. § 702.

(a) Plaintiffs' complaint.
Montana holds a permit that allows discharges into Flathead Lake from the State's Yellow Bay research facility. Montana's permit was issued by the State under the Montana Pollutant Discharge Elimination System ("MPDES"). Mont.Code Ann. § 75-5-605(2) (1994); Mont.Admin.R. 16.20.1300-.1347. Montana believes that because the EPA has decided to grant the Tribes treatment-as-state (TAS) status, the State will now be required to seek an additional permit from the EPA under its National Pollutant Discharge Elimination System ("NPDES") program. See 33 U.S.C. § 1342.
Lake County owns a wastewater treatment facility on the Reservation, which makes discharges into Post Creek. Lake County already holds an NPDES permit issued by the EPA.
The City of Ronan owns a wastewater treatment facility on the Reservation, which makes discharges into Crow Creek. Ronan holds an MPDES permit issued by the State of Montana. Ronan alleges that EPA is now requiring it to obtain an NPDES permit.
The Town of Hot Springs owns a wastewater treatment facility within the Reservation, which makes discharges into Hot Springs Creek. Hot Springs holds an MPDES permit issued by the State of Montana. Hot Springs alleges that EPA is now requiring it to obtain an NPDES permit.
Plaintiffs' First Claim for Relief asserts that the EPA's final decision is based upon an erroneous application of legal principles relating to the Tribes' inherent regulatory authority and that the interested parties were not granted an evidentiary hearing attacking the facts upon which the agency decision was based. Furthermore, Plaintiffs state that the final decision improperly subjects them to the civil regulatory authority of *948 the Tribes and infringes on Montana's authority under section 401 of the CWA.[2] Montana concludes that the EPA's decision to grant TAS status to the Tribes has or will in the future result in the State of Montana being deprived of its authority as a state under section 401 of the CWA.
Plaintiffs' Second Claim for Relief asserts that the Tribes are without authority to rely on the agency action for the purpose of regulating Plaintiffs' activities on the Reservation.
The Plaintiffs request a declaratory judgment that determines that the agency action granting TAS to the Tribes pursuant to section 518(e) of the CWA was unlawful and that the Tribes are without authority to rely upon the agency action.

(b) EPA's Answer to Plaintiffs' Complaint.
EPA concedes that Yellow Bay's compliance with the CWA is conditioned upon Yellow Bay's application for a NPDES permit if Yellow Bay discharges pollutants from a point source into waters of the United States on the Flathead Reservation.[3] EPA questions who historically considered Yellow Bay to be in compliance with the CWA. Likewise, EPA questions who historically considered Ronan's wastewater treatment facility to be in compliance with the Clean Water Act. EPA also admits that Ronan's compliance with the CWA is conditioned upon Ronan's application for and receipt of a federal NPDES permit if Ronan discharges pollutants from a point source into waters of the United States on the Flathead Reservation. EPA poses a similar question and states a similar admission as to the Town of Hot Springs.
EPA also avers that federal administrative remedies are available to any discharger who is required to obtain a permit from EPA pursuant to section 402 of the CWA. See 40 C.F.R. § 122-124 (1995). EPA admits that such a permit may include effluent limitations necessary to meet the water quality standards adopted by the Tribes. However, EPA asserts that it and not the Tribes will retain NPDES permitting authority on the Reservation,[4] and that it and not Montana has always held CWA regulatory jurisdiction over the waters of the United States on the Flathead Indian Reservation. The EPA also asserts that the court lacks jurisdiction over Plaintiffs' claims, that the complaint states claims for which relief cannot be granted, that Plaintiffs lack standing, that Plaintiffs' claims are not ripe for review and are not justiciable.

(c) Tribes' Answer to Plaintiffs' Complaint.
The Tribes admit they have waived their sovereign immunity for purposes of accepting service of Plaintiffs' First Amended Complaint. The Tribes assert that Plaintiffs' claims are not within the zone of interests meant to be protected by the Clean Water Act and that Plaintiffs' interest has not been or will not be injured or adversely affected by agency action within the meaning of 5 U.S.C. § 704. The Tribes assert that there is no actual controversy upon which this court may declare the rights and legal relations, and therefore Plaintiffs' claims are not justiciable. The Tribes assert that Montana has failed to timely challenge the 1991 regulations upon which EPA's decision is based; the Tribes assert that Montana's claim is stale since Montana commented on the regulations and/or actively participated in the formulation of those regulations by the EPA. Finally, the Tribes assert that the Plaintiffs have failed to allege facts sufficient to establish a valid facial challenge to the regulations *949 and policy complained of in Plaintiffs' complaint.

(d) Proposed Plaintiff-Intervenors' proposed complaint.
The JBC and the Irrigation Districts provide water for over one hundred thousand acres of irrigated land,[5] and the water is delivered from the federal Flathead Irrigation and Power Project. Approximately 2,000 farmers and ranchers own this land. Proposed Intervenors bring their complaint pursuant to the APA, 5 U.S.C. § 702. Intervenor Irrigation Districts assert inter alia that they have been granted the power by the Montana Legislature to appropriate water, acquire water rights, acquire reservoirs and dams, and acquire the land for such works. Mont.Code Ann. § 85-7-1904 (1995). The Irrigation Districts also assert that they hold the power to regulate, supervise, apportion and control water distribution. Mont. Code Ann. § 85-7-1922 (1995).
The JBC and the Irrigation Districts have filed numerous lawsuits involving the irrigation system on the Reservation. They have filed water rights claims in the Montana Water Court pursuant to the Montana Water Use Act, Mont.Code Ann. § 85-2-101, et seq. (1995). They have, with Intervenors Middlemist and Maughan, filed suit against the Tribes to contest tribal Ordinance 87A, the Aquatic Lands Conservation Ordinance ("ALCO"). Middlemist, et al. v. Pablo, et al., CV No. 95-68-M-CCL; Middlemist, et al. v. Pablo, et al., No. 95-343-CV (Tribal Court). Without explanation, proposed Plaintiff-Intervenors suggest that this court's decision in this case may have stare decisis or res judicata effect on the ongoing litigation in Middlemist v. Pablo.
Proposed Plaintiff-Intervenors Wayne Maughan, Ross Middlemist, William Slack and Glenn Murphy are irrigators and members of the JBC and the Irrigation Districts. They commonly undertake typical irrigation activities in the course of farming and ranching.
Proposed Plaintiff-Intervenors complain that they received no individual notice of the Tribes' application for TAS status because the EPA has specifically excluded individuals and local governments from the TAS notice and comment process. See 40 C.F.R. § 131.8(c)(2) (1995); 56 Fed.Reg. at 64884. The EPA notifies, and requests the comments of, only the relevant federal agencies and state and tribal governments. However, the EPA does place an announcement in appropriate newspapers, directing interested parties to submit their comments to the appropriate state government. Id. In this case, all public comments submitted through the State of Montana were considered by the EPA.
Proposed Plaintiff-Intervenors assert that the Tribes have previously attempted to recover from the United States certain water rights, hunting and fishing rights, rights to land, and exclusive use and occupation of the reservation. See Act of March 13, 1924, 43 Stat. 21; Act of July 30, 1946, 60 Stat. 715; Act of August 13, 1946, 60 Stat. 1049, Indian Claims Commission Act. Proposed Plaintiff-Intervenors theorize that the Tribes should now be precluded from making additional claims to sovereign authority over nonmember activity on fee land, having foregone such additional claims at earlier opportunities.
Proposed Plaintiff-Intervenors express concern that the Tribes might assert authority over either civil or criminal violations of the CWA. Proposed Plaintiff-Intervenors assert that they cannot receive a fair trial in a tribal court, which trial would, among other things, violate their right to be tried by a jury of their peers. Proposed Plaintiff-Intervenors object to the fact that the Tribes will not permit them to vote, hold office, sit on a jury, or act as tribal judges.
Proposed Plaintiff-Intervenors' First Claim for Relief asserts that the agency action is not in accordance with the law and has aggrieved them within the meaning of 5 U.S.C. § 702. The Second Claim for Relief asserts that the agency action was unlawful *950 because it denied Murphy the opportunity to be heard. The Third Claim for Relief asserts that the agency action was unlawful because it presumed that the Tribes have civil regulatory jurisdiction over Murphy. The Fourth Claim for Relief asserts that the agency action violates the supremacy clause of the United States Constitution in that Congress has previously divested the Tribes of civil regulatory jurisdiction, and EPA cannot now contradict that divestment. The Fifth Claim for Relief asserts that the agency action is unlawful because it divests them of their federal constitutional right to full and equal participation in the government under which they must live.

3. Applicable Statutes and Regulations.
The EPA administers the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387 (1987 & 1995 Cum.Supp.). The CWA was enacted in order to restore and maintain the quality of the Nation's waters, see 33 U.S.C. § 1251(a), and it prohibits the discharge from a point source[6] of any pollutant into the waters of the United States unless that discharge complies with the CWA. 33 U.S.C. § 1311(a). The CWA was amended in 1987 by the Water Quality Act of 1987 ("WQA"), P.L. 100-4, 101 Stat. 7. The WQA added a new provision, section 518, which allows the EPA to treat Indian tribes as states for certain purposes of the Act. 33 U.S.C. § 1377(e).
There are two major permit programs in the CWA. Section 402 of the CWA provides the framework for a permitting system for pollution dischargers, known as the National Pollutant Discharge Elimination System ("NPDES"). See 33 U.S.C. § 1342. Section 404 of the CWA provides the framework for an Army Corps of Engineers permitting system for discharges of dredged or fill material into the waters of the United States. See 33 U.S.C. § 1344.
The permit programs are based upon water quality standards that are set by the states pursuant to section 301(b)(1)(C) of the CWA, 33 U.S.C. § 1311(b)(1)(C). The CWA requires each state to adopt water quality standards for its intrastate and interstate waters. 33 U.S.C. § 1313(a)-(c). The EPA must approve the water quality standards set by states. 33 U.S.C. § 1313(c)(1), (3). When the EPA is the permitting authority, states have the opportunity to certify whether a discharge under a proposed permit will be consistent with its water quality standards. 33 U.S.C. § 1341. If the state concludes that its water quality standards will not be achieved, then the permit cannot issue unless it is modified to comply with the standards. Id.
Irrigation is not an activity regulated by the CWA, which specifically excludes "agricultural stormwater discharges and return flows from irrigated agriculture" from point source regulation. 33 U.S.C. § 1362(14). The CWA does not regulate the extraction or allocation of groundwater or surface water, or any other water quantity right. 33 U.S.C. § 1251(g). Instead, the CWA regulates pollutants added to surface water from point sources. See 40 C.F.R. § 122.1(b).
Under section 518(e) of the WQA, the EPA is authorized to treat an Indian tribe in the same manner as a state for certain purposes, including the development of water quality standards. 33 U.S.C. § 1377(e); 40 C.F.R. §§ 131.3-131.8 (1995). Section 518 provides that:
The Administrator is authorized to treat an Indian tribe as a State for purposes of title II and sections 104, 106, 303, 305, 308, 309, 314, 319, 401, 402, and 404 of this Act [33 U.S.C.S. §§ 1281 et seq., 1254, 1256, 1313, 1315, 1318, 1319, 1324, 1329, 1341, 1342, 1344] to the degree necessary to carry out the objectives of this section, but only if 
(1) the Indian tribe has a governing body carrying out substantial governmental duties and powers;
(2) the functions to be exercised by the Indian tribe pertain to the management and protection of water resources which are held by an Indian tribe, held by the United States in trust for Indians, *951 held by a member of an Indian tribe if such property interest is subject to a trust restriction on alienation, or otherwise within the borders of an Indian reservation; and
(3) the Indian tribe is reasonably expected to be capable, in the Administrator's judgment, of carrying out the functions to be exercised in a manner consistent with the terms and purposes of this Act and of all applicable regulations.
Such treatment as a State may include the direct provision of funds reserved under subsection (c) to the governing bodies of Indian tribes, and the determination of priorities by Indian tribes, where not determined by the Administrator in cooperation with the Director of the Indian Health Service. The Administrator, in cooperation with the Director of the Indian Health Service, is authorized to make grants under title II of the Act in an amount not to exceed 100 percent of the cost of a project. Not later than 18 months after the date of the enactment of this section, the Administrator shall, in consultation with Indian tribes, promulgate final regulations which specify how Indian tribes shall be treated as States for purposes of this Act. The Administrator shall, in promulgating such regulations, consult affected States sharing common water bodies and provide a mechanism for the resolution of any unreasonable consequences that may arise as a result of differing water quality standards that may be set by States and Indian tribes located on common bodies of water. Such mechanism shall provide for explicit consideration of relevant factors including, but not limited to, the effects of differing water quality permit requirements on upstream and downstream dischargers, economic impacts, and present and historical uses and quality of the waters subject to such standards. Such mechanism should provide for the avoidance of such unreasonable consequences in a manner consistent with the objective of this Act.
* * * * * *
(h)(1) "Federal Indian reservation" means all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation; and
(2) "Indian tribe" means any Indian tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian reservation.
33 U.S.C. § 1377(e), (h) (1987 & Cum.Supp. 1995) (emphasis added). The court has reviewed the amicus curiae brief submitted by the Assiniboine and Sioux Tribes of the Fort Peck Reservation, Montana, whose application to EPA for TAS status is now pending. Amicus counsel asserts, based upon the statutory language emphasized above, that section 518 provides tribes with federally-delegated tribal jurisdiction over non-Indians. Their reading emphasizes the fact that in section 518(h) Congress expressly included all lands of the Reservation within its definition of the Reservation, "notwithstanding the issuance of any patent," and in section 518(e) Congress expressly specified that the Tribes should manage and protect water resources that are (1) held by an Indian tribe, (2) held by the United States in trust for Indians, (3) held by a member of an Indian tribe if such property interest is subject to a trust restriction on alienation, or (4) otherwise within the borders of an Indian reservation. It appears that the legislative history is ambiguous, although only arguably so since the legislative history relates mainly to concern regarding whether section 518(e) pertains to water quantity rights of non-Indians, which of course it does not.
Congress may delegate such jurisdiction to Indian tribes. See United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717-18, 42 L.Ed.2d 706 (1975) (affirming federal conviction for violation of tribal liquor ordinance on basis of a federal delegation to the Wind River Tribe of right to regulate liquor trade on reservation). Indeed, the statutory language seems to indicate plainly that Congress did intend to delegate such authority to tribes if the three criteria listed in section 518(e) were met. In fact, in the Brendale decision, Justice White, writing for the Court, cited this very statute as an example *952 of an explicit delegation of Congressional authority to Indian tribes. See Brendale v. Confederated Tribes and Bands of the Yakima Nation, 492 U.S. 408, 428, 109 S.Ct. 2994, 3006-07, 106 L.Ed.2d 343 (1989) (White, J.). This interpretation of sections 518(e) and (h)(1) comports with common-sense, for it seems highly unlikely that Congress contemplated granting to tribes the authority to set water quality standards for only those segments of streams traversing or appurtenant to Indian lands, while at the same time state water quality standards would remain in effect on the reservation for those same streams where the stream segments traverse or bound non-Indian land. However, EPA determined that it would take the more cautious view, that Congress did not expressly delegate jurisdiction to tribes over non-Indians and that tribes would have to prove on a case-by-case basis that they possess such jurisdiction. See 56 Fed.Reg. 64,876, 64,879-80 (1991).
The application regulations are found at 40 C.F.R. § 131.8, adopted by the EPA on December 12, 1991. 56 Fed.Reg. 64895 (Dec. 12, 1991), as amended at 59 Fed.Reg. 64344 (Dec. 14, 1994). § 131.8(a) provides that:
The Regional Administrator ... may accept and approve a tribal application for purposes of administering a water quality standards program if the Tribe meets the following criteria:
(1) The Indian Tribe is recognized by the Secretary of the Interior ...,
(2) The Indian Tribe has a governing body carrying out substantial governmental duties and powers,
(3) The water quality standards program to be administered by the Indian Tribe pertains to the management and protection of water resources which are within the borders of the Indian reservation and held by the Indian Tribe, within the borders of the Indian reservation and held by the United States in trust for Indians, within the borders of the Indian reservation and held by a member of the Indian Tribe if such property interest is subject to a trust restriction on alienation, or otherwise within the borders of the Indian reservation, and
(4) The Indian Tribe is reasonably expected to be capable, in the Regional Administrator's judgment, of carrying out the functions of an effective water quality standards program in a manner consistent with the terms and purposes of the Act and applicable regulations.
40 C.F.R. § 131.8(a) (1995).
In the preamble to EPA's Final Rule regarding the procedures by which an Indian tribe may qualify for TAS, the EPA analyzes inherent tribal authority over reservation lands owned in fee by nonmember. 56 Fed. Reg. 64876. Specifically, the EPA analyzes Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and Brendale v. Confederated Tribes and Bands of the Yakima Nation, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989). The EPA adopted an interim operating rule, to be applied on a case-by-case basis, to determine whether an Indian tribe has authority over reservation lands owned in fee by nonmembers. 56 Fed. Reg. at 64878-79.
The EPA's operating rule is based on the second Montana exception allowing for tribal authority over nonmember lands: "a tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Montana, 450 U.S. at 565-66, 101 S.Ct. at 1258. The EPA's operating rule requires a tribe to show that the "potential impacts of regulated activities on the tribe are serious and substantial." 56 Fed.Reg. at 64878. In other words, the EPA does not require a tribe to wait until a point source discharger located on non-Indian lands is actually polluting tribal waters before the tribe can apply for TAS status; instead, a tribe can simply show that there is a potential for such pollution in the future and were such pollution to occur it would have serious and substantial impacts upon the tribe.
In determining the scope of inherent tribal authority for purposes of section 518(e), the EPA considered the Supreme Court's decision *953 in Brendale v. Confederated Tribes and Bands of the Yakima Nation, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (4:2:3 split, deciding that county should have exclusive zoning authority over non-Indian property in predominantly fee area but tribe should have exclusive zoning authority over non-Indian property in predominantly tribal area). The EPA determined that the primary significance of Brendale is that its result is consistent with the exceptions stated in Montana:
Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate ... the activities of non-members who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements.... A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.
Montana, 450 U.S. at 565-66, 101 S.Ct. at 1258 (citations omitted). The EPA interpreted Brendale as finding no tribal jurisdiction where the proposed activities "would not threaten the Tribe's ... health or welfare." Brendale, 492 U.S. at 432 (White, J., writing for the Court). EPA concluded that the best policy is to determine tribal authority over nonmember fee lands on a case-by-case basis, by examining potential threats against water quality as they relate to a particular Tribe's health or welfare. EPA noted that in Brendale the issue was zoning, whereas in water quality management it is easier to establish effects on tribal health and welfare. Id. at 64879.[7] Therefore, the EPA decided to require a showing from each tribal applicant "that the potential impacts of regulated activities on the tribe are serious and substantial." 56 Fed.Reg. at 64878.
In that 1991 rule, however, the EPA reserved to itself the opportunity to take into account environmental statutes and legislative findings regarding the seriousness of water pollution. Id. In making a factual finding of impact of a water-related activity on a particular tribe, the EPA also relies on its special expertise and practical experience in the areas of water management and the impact of clean water on critical habitat. Id. The EPA notes that pollutants in surface waters are mobile by nature, and it is impractical to try to separate water quality impairment of tribal waters from impairments of non-Indian waters. Id. "EPA believes that a `checkerboard' system of regulation, whereby the Tribe and State split up regulation of surface water quality on the reservation, would ignore the difficulties of assuring compliance with water quality standards when two different sovereign entities are establishing standards for the same small stream segments." Id. In light of the importance of water quality management in protecting public health and safety, and in light of the mobile nature of water pollution, the EPA made a generalized finding that there is a relationship between water quality and tribal health and welfare.
The 1991 rule further determines that in order to meet the requisites of § 131.8, a tribe need only assert that there are waters in the reservation used by the tribe or tribal members, the waters are subject to protection under the CWA, and impairment of those waters by the activities of non-Indians would have a serious and substantial effect on the health and welfare of the Tribe. Id. at 64879. At that point, according to the EPA, a tribe has made an adequate showing of tribal jurisdiction over fee lands, and it is up to the competing governmental entity to demonstrate the tribe's lack of jurisdiction. Id. Presumably, the competing governmental entity would need to prove that impairment of tribal waters by the activities of non-Indians would not have a serious and substantial *954 effect on the health and welfare of a tribe.

4. Legal Standards on Motion to Intervene.

(a) Intervention as of Right.
The four-part test for intervention as of right under Rule 24(a) is as follows:
(1) The motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.
Sierra Club v. Environmental Protection Agency, 995 F.2d 1478, 1481 (9th Cir.1993). The proposed intervenor bears the burden of demonstrating that he is entitled to intervene under Rule 24. Petrol Stops Northwest v. Continental Oil Co., 647 F.2d 1005, 1010 n. 5 (9th Cir.), cert. denied, 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 639 (1981).

(b) Permissive Intervention.
A court may exercise its discretion to grant permissive intervention when (1) the motion is timely, Rule 24(b); (2) the movant's claim or defense and the main action have a question of law or fact in common, Rule 24(b)(2); and (3) movant has an independent ground of jurisdiction to support permissive intervention. See Greene v. United States, 996 F.2d 973, 978 (9th Cir.1993); see also 3B Moore's Federal Practice, § 24.18. If proposed intervenors make these three showings, a court may then utilize its discretion to determine the most fair and most efficient method of handling the case.

5. Discussion of Motion to Intervene.
The EPA Decision Document notes that tribal regulatory jurisdiction over nonmembers is not being determined for all purposes, but merely for the purpose of setting water quality standards for the Reservation under 40 C.F.R. § 131.8(a)(3). The EPA intends to continue issuing federal permits under section 402 of the CWA (NPDES), which the EPA will then enforce in federal court.
The Defendants contend that the proposed Plaintiff-Intervenors have no "significantly protectable" interest in this litigation. Proposed Plaintiff-Intervenors claim ten separate interests: (1) ownership of real property within the reservation; (2) ownership of water quantity rights within the Reservation; (3) ownership of a water use permit issued by the State of Montana and accompanying right to operate a reservoir within the Reservation; (4) attempted participation in the administrative process for the challenged decision; (5) participation in other litigation allegedly relating to the subject matter of this case; (6) interests in retaining constitutional rights; (7) interests in real property; (8) interests in prior acts of Congress interpreting tribal authority; (9) interest in maintaining JBC and the Districts as local governments; (10) interests in retaining the right to a trial by a jury of their peers for CWA civil violations and the right to participate in the administrative process by which the agency decision was reached.
However, the federal Defendants point out that the proposed intervenors have no special interest in the subject matter of this particular litigation  water quality standards of surface waters of the Flathead Indian Reservation. Because the proposed intervenors' sole interest lies in irrigation, they have no "significantly protectable" interest in this case. The federal Defendants inform the court that none of the proposed intervenors holds an NPDES permit which might potentially be modified due to any change in water quality standards imposed by the Tribes. Therefore, proposed intervenors are not in any way directly affected by the transfer of water quality standards authority from the State to the Tribes. Put another way, the transfer of the right to establish water quality standards from the State to the Tribes will have no immediate or any foreseeable, demonstrable effect upon the proposed intervenors.
In Sierra Club v. Environmental Protection Agency, 995 F.2d 1478, the Ninth Circuit concluded that the CWA protects the interest of a person who discharges pollutants pursuant *955 to a NPDES permit, and held that an NPDES permit holder could intervene in a case which might result in stricter permit discharge limits. Here, none of the proposed Intervenors possess an NPDES permit or would in any demonstrable way be affected by the setting of water quality standards by the Tribes. Neither do any of the proposed Intervenors engage in any activity that is regulated by the CWA.[8] Proposed Intervenors' reliance on their possession of a water use permit relating to allocation of reservoir water is of no effect because it has no relationship to the CWA or the issues in this case.
Proposed Intervenors also cite Mille Lacs Band of Chippewa Indians v. Minnesota, 989 F.2d 994 (8th Cir.1993), to support their intervention. However, that appellate panel ruled that certain counties and individuals should have been allowed to intervene in that litigation because their land would be directly affected by the Mille Lacs Band's right to enter their properties for the purposes of hunting and fishing. There is no such clear link in this case.
Proposed Intervenors assert that their interests are significantly protectable, and that the defendants have failed to adequately address their interests. Perhaps that is so because their interests are so vaguely stated. For example, proposed Intervenors assert that any expansion of governmental power by the Tribes causes their property values to drop; thus their purported property interest is in keeping tribal government small.[9] This general concept may be accurate, but the interest is vague and attenuated, and there is no statute that entitles proposed Intervenors to bring such a claim.
Similarly vague and confusing is proposed Intervenors interest in protecting their right to trial by jury of their peers. This court cannot fathom what it is in this case that relates to the right to trial by jury of one's peers or in what way this right would be violated.
Proposed Intervenors state that they are also (in other litigation) challenging the Tribes' right to require them to obtain a permit from the Shoreline Protection Office of the Natural Resources Department of the Tribes pursuant to Tribal Ordinance 87A (the Aquatic Lands Conservation Ordinance ("ALCO")). See Middlemist v. Pablo, CV 95-68-M-CCL. Proposed Intervenors make the claim that the fact that they are litigating tribal jurisdiction over non-member lands in Middlemist should entitle them to intervene in this litigation. However, proposed Intervenors do not have any apparent interest in permitted discharges of pollutants regulated by the CWA. Furthermore, the EPA's finding of tribal jurisdiction over surface waters appurtenant to non-member lands is limited to the statutes and regulations in issue in this case.
This court finds that the proposed Intervenors have no significantly protectable interest in the outcome of this litigation and therefore are not entitled to intervene as of right.
As to permissive intervention, this court questions whether proposed Intervenors *956 have any independent grounds of jurisdiction to support their permissive intervention. See Greene v. United States, 996 F.2d 973, 978 (9th Cir.1993) (requiring independent grounds of jurisdiction to support permissive intervention). The Administrative Procedures Act does not provide independent jurisdictional basis; it only prescribes standards for reviewing agency action once jurisdiction is otherwise established. Staacke v. United States Secretary of Labor, 841 F.2d 278 (9th Cir.1988). Proposed Intervenors have no statutory basis for suit pursuant to the CWA. See Middlesex Cty. Sewerage Auth. v. Sea Clammers, 453 U.S. 1, 15-18, 101 S.Ct. 2615, 2623-25, 69 L.Ed.2d 435 (concluding that Congress intended that no private remedies be implied by the CWA in addition to those expressly provided). However, even if proposed intervenors could establish an independent ground of jurisdiction, this court would not be inclined to grant permissive intervention for the reason that such intervention would be likely to unduly delay or complicate the resolution of this case. Such an intervention would not lead to the fairest and most efficient handling of this case.

6. Cross Motions for Summary Judgment.

(a) Legal Standard.
A party is entitled to summary judgment in its favor if it can "show that there is no genuine issue as to any material fact and ... [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is particularly appropriate where, as here, review is on the administrative record. Adams v. United States, 318 F.2d 861, 865 (9th Cir.1963); Denison v. Udall, 248 F.Supp. 942, 944 (D.Ariz.1965) ("there should be no de novo review by this Court, but a determination that the final administrative decision is or is not substantially supported by the administrative record. Therefore, a summary judgment pursuant to [Fed. R.Civ.P. 56] may be granted for either party in response to their cross motions"). See also Florida Fruit & Vegetable Ass'n v. Brock, 771 F.2d 1455, 1459 (11th Cir.1985), cert. denied, 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986) (Summary judgment procedure is "particularly appropriate" in record review cases) (quoting 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2733 (1983)).

(b) Discussion.
The focus of the cross motions for summary judgment is whether the EPA properly interpreted Montana and Brendale when it concluded that the Tribes could meet the second Montana exception. The Plaintiffs assert that the Montana test has given way to an open-closed area analysis first enunciated in Brendale and repeated in South Dakota v. Bourland, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). The parties are in agreement that this court must subject EPA's interpretation of case law to de novo review. See Arizona Pub. Serv. Co. v. Aspaas, 69 F.3d 1026, 1031 (9th Cir.1995).
However, in reviewing the final EPA action, this court may not make a de novo determination. Instead, this court must determine whether the EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971); Rybachek v. Environmental Protection Agency, 904 F.2d 1276, 1284 (9th Cir. 1990). This court's function is to ensure that the agency considered all of the relevant factors and that its decision contained no `clear error of judgment.'" Arizona v. Thomas, 824 F.2d 745, 748 (9th Cir.1987) (citation omitted). This court need not determine that the EPA's construction of the CWA is the only construction possible; instead, this court must determine that EPA's understanding of this CWA provision is sufficiently rational as to preclude this court from substituting its judgment for that of EPA. Chemical Mfrs. Ass'n v. Natural Resources Defense Council, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107-08, 84 L.Ed.2d 90 (1985). Finally, "[a]n agency's interpretation of its own regulations is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation." Washington State Health Facilities v. DSHS, 879 F.2d 677, 681 (9th *957 Cir.1989) (citing United States v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977)).
The Montana test has been previously applied with regard to civil regulatory jurisdiction of the Tribes over nonmember lands on the Flathead Reservation. For example, in Confederated Salish & Kootenai Tribes v. Namen, 665 F.2d 951, 964 (9th Cir.), cert. denied, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982), a Ninth Circuit panel determined that the Tribes' regulation of nonmember property bordering Flathead Lake under a shoreline protection ordinance was a permissible exercise of tribal authority under second Montana exception because there was a potentiality for serious impacts on the water quality of the lake.
The EPA analyzed relevant case law, including Montana and Brendale, and determined that the Montana test is still utilized by the United States Supreme Court in evaluating tribal regulatory jurisdiction over nonmember lands. The EPA declined to interpret section 518(e) as a direct grant of regulatory authority to tribes, although there are some who do interpret section 518(e) in that fashion.[10] Instead, the EPA determined that it would examine tribal authority on a case-by-case basis. In the case of the Tribes, the EPA found sufficient facts to support the Tribes' claim that pollution of the surface waters traversing or appurtenant to non-member land would have serious and substantial impact on the Tribes' health and welfare. Such fact finding by the EPA is entitled to substantial deference. Arkansas v. Oklahoma, 503 U.S. 91, 112, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992); Central Arizona Water Cons. Dist. v. Environmental Protection Agency, 990 F.2d 1531, 1539-40 (9th Cir.), cert. denied, 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993). Even if alternative findings could be supported by the administrative record, the EPA's factual findings should be upheld if they are supported by the administrative record. Arkansas v. Oklahoma, 503 U.S. at 112, 112 S.Ct. at 1060.
Nevertheless, Plaintiffs assert that the EPA' reading of Montana and Brendale leads to an erroneous legal determination that the Tribes possess inherent regulatory jurisdiction over nonmember lands within the Reservation. Their reading of Brendale and Bourland,[11] in particular, leads them to the conclusion that inherent tribal jurisdiction exists only when there is a vacuum of state or federal remedies. However, both Brendale and Bourland support the continuing validity of the Montana test, and in Brendale the Supreme Court used the Montana test to determine that the tribe did have regulatory jurisdiction over the the Brendale property. Three Justices in Brendale supported the continued use of the Montana test. 492 U.S. at 462, 109 S.Ct. at 3024 (Opinion of Blackmun, J.). Four other Justices support the use of a modified Montana test that would require the tribe to show that there would be "demonstrably serious impacts" on the tribe. Id. at 428-32, 109 S.Ct. at 3006-09 (Opinion of White, J.).[12] Only two Justices advocated distinguishing between open and closed areas. Id. at 440-44, 109 S.Ct. at 3013-15. (Opinion of Stevens, J.).
The Supreme Court subsequently considered Brendale in County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 266-67, 112 *958 S.Ct. 683, 692-93, 116 L.Ed.2d 687 (1992), and stated that Justice White's opinion (requiring "demonstrably serious impacts") is consistent with the test enunciated in Montana. Because Justice White's opinion in Brendale essentially set a stricter standard for the Montana test, EPA determined that it would apply that stricter standard to any tribe applying for TAS status.
The EPA also made several generalized findings in its regulations:
1. The CWA constitutes a congressional finding that impacts to water quality give rise to impacts to human health and welfare.
2. Water quality standards must take into consideration public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial and other purposes.
3. Because of the mobile nature of pollutants, it is impractical to regulate stream segments according to the member/nonmember checkerboard.
EPA's expertise and experience in making these determinations is not to be treated lightly. Also, the EPA's environmental regulatory policy is to avoid administrative complexity such as checkerboarding and fractionalizing of reservations into trust and fee lands. This regulatory policy serves as a foundation for EPA's Indian policy, which calls for a lead role for tribal governments in managing programs to protect the reservation environment and its populace. See EPA Policy for the Administration of Environmental Programs on Indian Reservations, (Nov. 8, 1984). This court should defer to the EPA's expertise and experience when it reconciles its environmental policy with its Indian policy. State of Wash., Dept. of Ecology v. EPA, 752 F.2d 1465, 1469 (deferring to EPA' reconciliation of environmental policy and Indian policy in finding that states lack authority to administer Resource Conservation and Recovery Act on Indian reservation).
The EPA also made a specific finding as to the Tribes' inherent jurisdiction over surface waters traversing or appurtenant to non-member lands within the Reservation. The EPA affirmed that the Tribes require clean water for a domestic water supply and to maintain fish, aquatic life and other wildlife for both subsistence and cultural reasons. Because the Tribes had explicitly asserted that impairment of tribal waters by activities of non-members would have a serious and substantial effect on the health and welfare of the Tribes, and because that assertion corresponded to the EPA's generalized findings, the EPA found that the Tribes' possess inherent authority to set water quality standards for all surface waters within the Reservation. The EPA also found that the State failed to demonstrate that such authority was lacking. The EPA's finding was also based upon numerous instances of regulated activities occurring on nonmember lands that caused serious and substantial impacts of the Tribes' water resources, including discharges from an RV park and campground, discharges from sewage treatment plants, discharges from a town's storm drains, leakage from gasoline service stations, diesel fuel spills, and gas tank overflows.

7. Conclusion.
On the basis of the foregoing description of the EPA's reasoning and findings, and after careful consideration of the arguments of the parties and review of the administrative record, this court finds that the EPA's final decision is supported by the administrative record, consistent with EPA's regulations, and not contrary to law, and should be upheld. Accordingly,
IT IS HEREBY ORDERED:
1. Proposed Intervenor's motion for leave to file memorandum of supplemental authorities (Docket # 30) is GRANTED.
2. Defendant Tribes' motion for summary judgment (Docket # 47) and Defendant EPA's motion for summary judgment (Docket # 43) are GRANTED.
3. Plaintiffs' motion for summary judgment (Docket # 45) is DENIED.
4. Defendant Tribes' motion to strike initial brief of intervenor and motion for summary judgment (Docket # 47) is GRANTED.
*959 5. Defendant Tribes' motion for leave to file errata to brief in support of Tribes' motion for summary judgment (Docket # 53) is GRANTED.
6. Proposed Intervenors' motion for leave to file response brief to initial briefs (Docket # 57) is DENIED.
7. Proposed Intervenors' motion for leave to file reply brief and initial brief nunc pro tunc (Docket # 64) is DENIED.
IT IS FURTHER ORDERED that Plaintiffs' complaint is DISMISSED and all relief is denied.
The Clerk is directed forthwith to notify the parties and the proposed Intervenors of entry of this order.
NOTES
[1] The court notes that, according to the EPA Regional Administrator, the water quality standards actually adopted by the Tribes are "virtually identical" to the water quality standards set by Montana. See Letter of William P. Yellowtail to Senator Conrad Burns, Exhibit 2, Reply Brief in Support of Motion to Intervene.
[2] Under section 401, 33 U.S.C. § 1341, the relevant state must certify to the EPA that a proposed NPDES permit will be in compliance with state's water quality standards. Of course, because the Tribes have been granted TAS status, Montana is no longer the certifying authority for purposes of section 401. However, whether Montana or the Tribes certifies compliance, in either instance the EPA retains final decision-making authority over the issuance of NPDES permits.
[3] The Tribes' Answer to Plaintiffs' Complaint avers that the Yellow Bay Wastewater Treatment Facility made an application for an NPDES permit on June 19, 1995.
[4] See EPA's Memorandum in Opposition to JBC's Motion to Intervene, at p. 8.
[5] The Flathead Indian Reservation encompasses some 1.2 million acres, and contains approximately 4,000 natural stream miles. In addition, approximately 1300 miles of irrigation canals and laterals exist under the authority of the Flathead Agency Irrigation Division/Flathead Irrigation Project, Bureau of Indian Affairs, United States Department of the Interior.
[6] "[A]ny discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "[A]gricultural stormwater discharges and return flows from irrigation" are excluded from the definition of "point source." Id.
[7] This is so because zoning impacts are normally discrete and localized, whereas water pollution creates environmental health risks that may affect many people miles from the source. When tribal members use surface water, or take fish or animal resources that use the surface water, pollution from non-Indian lands within the reservation could have a grave impact upon tribal health and environmental interests.
[8] It is conceivable that one or more of the proposed Intervenors could be engaging in regulated activity. See 40 C.F.R. § 122.23 (requiring NPDES permit for Concentrated Animal Feeding Operations). See also Appendix B to Part 122, defining Concentrated Animal Feeding Operations as having more than 1,000 slaughter and feeder cattle, 700 mature dairy cattle (milked or dry), 2,500 swine, 500 horses, 10,000 sheep or lambs, etc., confined to a lot not having vegetative growth for at least 45 days per year. However, because none of the proposed Intervenors possesses an NPDES or asserts that he engages in any regulated activity requiring an NPDES permit, the court assumes that none of their farm and ranch operations meets the criteria for a Concentrated Animal Feeding Operation.
[9] Proposed Intervenors present the affidavit of Mr. Stelling, a certified real estate agent/broker and owner of a real estate firm in western Montana. Mr. Stelling concludes that "I am convinced that until and unless the issue of tribal jurisdiction over non-member property is resolved with a finding that they do not have such authority, property values will continue to be lower than comparable lands in other areas." (Stelling Aff., Exhibit 8, Mem.Supp.Interv.) It is apparent that proposed Intervenors believe that their land should have comparable values to off-reservation land. Standing alone, this claim for loss of property value tied to strength of tribal government does not suffice to support intervention as of right, and the cases cited by proposed Intervenors do not support the contention.
[10] See 56 Fed.Reg. 64879-80. See also Brief Amicus Curiae of the Assiniboine and Sioux Tribes of the Fort Peck Reservation, Montana.
[11] South Dakota v. Bourland, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). In Bourland, the Cheyenne River Sioux Tribe sought to regulate hunting and fishing activities of non-Indians on the Oahe Reservoir, a federal facility within the exterior boundaries of their reservation. The opinion cites Montana's general rule that the opening of Indian lands causes a tribe to lose its treaty-based right to regulate non-Indian activities. However, Bourland also goes on to cite the Montana exception allowing for regulation of activities that threaten or directly impact the political integrity, economic security, or health and welfare of the tribe. Finally, the Bourland opinion remanded the case back to the circuit court for review of the district court's findings regarding the impact of non-Indian activities on tribal health and welfare.
[12] It is noteworthy that Justice White cites TAS status under the CWA as providing an example of an express Congressional delegation of tribal regulatory authority over non-Indian lands. Brendale, 492 U.S. at 428, 109 S.Ct. at 3006-07.