211 F.3d 1280 (D.C. Cir. 2000)
 Arizona Public Service Company, Petitioner
v.
Environmental Protection Agency, Respondent
State of Michigan, et al., Intervenors
 Nos. 98-1196, 98-1203, 98-1206, 98-1207, 98-1208
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued January 27, 2000
Decided May 5, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 On Petitions for Review of an Order of the Environmental Protection Agency
 Thomas Sayre Llewellyn argued the cause for petitioner Arizona Public Service Company. With him on the briefs were Michael B. Wood and George Y. Sugiyama.
 Henry V. Nickel argued the cause for petitioners National Association of Manufacturers, et al. and Intervenors State of Michigan and Central and South West Services, Inc. With him on the briefs were David S. Harlow, John B. Weldon, Jr., Brian J. Renaud, Jennifer M. Granholm, Attorney General for the State of Michigan, and John Fordell Leone, Assistant Attorney General for the State of Michigan. Norman W. Fichthorn, Cynthia H. Evans, Roy S. Belden, Janice S. Amundson, Donald D. Skypeck, Harold P. Quinn, Jr., and Thomas L. Casey, Solicitor General for the State of Michigan, entered appearances.
 Thomas A. Lorenzen and Cynthia A. Drew, Attorneys, United States Department of Justice, argued the cause for respondent. With them on the briefs were Lois Schiffer, Assistant Attorney General, Anthony F. Guadagno and Michael W. Thrift, Attorneys, United States Environmental Protection Agency.
 Jill E. Grant argued the cause for intervenors Gila River Indian Community, et al. With her on the brief were William W. Quinn and Jeanette Wolfley. Reid P. Chambers entered appearances.
 Before: Edwards, Chief Judge, Ginsburg and Rogers, Circuit Judges.
 Opinion for the Court filed by Chief Judge Edwards.
 Opinion concurring in part and dissenting from Part II.A. filed by Circuit Judge Ginsburg.
 Edwards, Chief Judge:
 
 
 1
 In 1990, Congress passed a compendium of amendments to the Clean Air Act ("CAA" or "the Act"). This case concerns those amendments that specifically address the power of Native American nations (or "tribes") to implement air quality regulations under the Act. Petitioners challenge the Environmental Protection Agency's ("EPA" or "the Agency") regulations, promulgated in 1998, implementing the 1990 Amendments. See Indian Tribes: Air Quality Planning and Management, 63 Fed. Reg. 7254 (1998) (to be codified at 40 C.F.R. pts. 9, 35, 49, 50, and 81) ("Tribal Authority Rule"). Petitioners' principal contention is that EPA has granted too much authority to tribes.
 
 
 2
 Petitioners' primary challenges focus on two issues. The first is whether Congress expressly delegated to Native American nations authority to regulate air quality on all land within reservations, including fee land held by private landowners who are not tribe members. The second is whetherEPA has properly construed "reservation" to include trust lands and Pueblos.
 
 
 3
 Petitioners also raise several other challenges to the Tribal Authority Rule. They argue: (1) that EPA violated the Act in authorizing tribes to administer programs affecting nonreservation "allotted lands" and "dependent Indian communities"; (2) that EPA unlawfully declined to accept public comments on applications to regulate by Native American nations; (3) that EPA improperly held that the 1990 Amendments abrogated preexisting contracts under which tribes agreed not to regulate certain privately-held land; and (4) that EPA improperly interpreted the 1990 Amendments to exempt Native American nations from certain of the Act's judicial review requirements.
 
 
 4
 We find petitioners' challenges to be mostly meritless. We hold that the Agency did not err in finding delegated authority to Native American nations to regulate all land within reservations, including fee land owned by nonmembers. We also uphold EPA's construction of "reservation" to include trust lands and Pueblos. Likewise, we reject the challenge to the Agency's decision to exempt Native American nations from some of the Act's judicial review requirements. Petitioners' complaint regarding the adequacy of public comment on tribal applications is moot. And petitioners' claim that EPA has abrogated preexisting agreements not to regulate is unripe for review, as is one of petitioners' arguments challenging the Agency's decision on the Act's judicial review requirements.
 
 I. BACKGROUND
 A. Statutory Background
 
 5
 The Act establishes a framework for a federal-state partnership to regulate air quality. The provisions of the 1990 Amendments under review, fairly read, constitute an attempt by Congress to increase the role of Native American nations in this partnership. There are three areas of regulation under the Act particularly relevant to this case.
 
 
 6
 First, the Act grants states primary responsibility for assuring that air quality meets national standards. See 42 U.S.C. S 7407(a) (1994). States meet this burden by submitting state implementation plans ("SIPs") that "provide[ ] for implementation, maintenance, and enforcement" of these standards. Id. S 7410(a)(1) (1994). SIPs must be approved by the Agency before they may be federally enforced. In 1990, S 7410 was amended to authorize Native American nations to submit tribal implementation plans ("TIPs") "applicable to all areas ... located within the exterior boundaries of the reservation." Id. S 7410(o).
 
 
 7
 Second, the Act permits states and Native American nations to "redesignate" lands pursuant to the Act's Prevention of Significant Deterioration ("PSD") program. See id. S 7474(a), (c) (1994). Under the PSD program, land is classified as Class I, II, or III. The land's classification determines the maximum allowable increase over the baseline by which concentrations of sulfur dioxide and other particulate matter shall not be exceeded. See id. S 7473 (1994). Land may, under certain circumstances, be redesignated as Class I, II, or III. See id. S 7474(a). Since 1977, Native American nations have had authority to redesignate land "within the exterior boundaries of reservations." Id. S 7474(c).
 
 
 8
 Finally, under Title V of the Act, states must develop a comprehensive permitting program applicable to major air pollution sources. See id. S 7661a (1994). The Agency must approve the permitting program; if none is approved, EPA must promulgate a permitting program that will be federally enforceable. See id. S 7661a(d)(3). One of the requirements for approval is that the program provide for judicial review of permitting actions. See id. S 7661a(b)(6), (7). Petitioners claim that the Agency has improperly interpreted the 1990 Amendments to giveNative American nations the possibility of exemption from some portions of the judicial review requirements.
 
 
 9
 Importantly, the 1990 Amendments added language to the Act granting EPA the "author[ity] to treat Indian tribes as States under this chapter," id. S 7601(d)(1)(A) (1994), provided tribes meet the following requirements:
 
 
 10
 (A) the Indian tribe has a governing body carrying out substantial governmental duties and powers;
 
 
 11
 (B) the functions to be exercised by the Indian tribe pertain to the management and protection of air re-sources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction; and
 
 
 12
 (C) the Indian tribe is reasonably expected to be capable, in the judgment of the Administrator, of carrying out the functions to be exercised in a manner consistent with the terms and purposes of this chapter and all applicable regulations.
 
 
 13
 Id. S 7601(d)(2).
 
 
 14
 The 1990 Amendments also directed EPA to promulgate regulations "specifying those provisions of this chapter for which it is appropriate to treat Indian tribes as States." Id. If the Agency "determines that the treatment of Indian tribes as identical to States is inappropriate or administratively infeasible," EPA may announce other ways for the Agency to administer the program "so as to achieve the appropriate purpose." Id. S 7601(d)(4).
 
 B. The Challenged Rule
 
 15
 On August 25, 1994, EPA proposed rules to implement the 1990 Amendments. See Proposed Tribal Authority Rule, 59 Fed. Reg. 43,956 (1994) (proposed Aug. 25, 1994). On February 12, 1998, after receiving and responding to public comments, EPA issued the final Tribal Authority Rule. See Tribal Authority Rule, 63 Fed. Reg. at 7254. The Agency first found that the 1990 Amendments constitute a delegation of federal authority to regulate air quality to Native American nations within the boundaries of reservations, regardless of whether the land is owned by the tribes. See id. The Agency read the statute to support this "territorial view of tribal jurisdiction," authorizing a "tribal role for all air resources within the exterior boundaries of Indian reservations without distinguishing among various categories of on reservation land." Id. EPA believed that this "territorial approach ... best advances rational, sound, air quality management." Id. at 7255. Thus, the Agency determined that Congress delegated to tribes the authority to regulate air quality in areas within the exterior boundaries of a reservation.
 
 
 16
 The Act does not define "reservation" for the purposes of tribal regulation. EPA interpreted "reservation" to include "trust lands that have been validly set apart for the use of a tribe even though the land has not been formally designated as a reservation." Id. at 7258. The Agency explained that this interpretation was consistent with the Supreme Court's definition of "reservation" in Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505 (1991). EPA held that it would decide on a case-bycase basis whether other types of land may be considered "reservations" under the Act. See Tribal Authority Rule, 63 Fed. Reg. at 7258.
 
 
 17
 For areas not within a "reservation," the Agency determined that a tribe would be allowed to regulate such areas if the tribe could demonstrate inherent jurisdiction over the particular non-reservation area under general principles of federal Indian law. See id. at 7259. This means that tribes may propose air quality regulations in "allotted land" and "dependent Indian communities" provided they can otherwise demonstrate inherent jurisdiction over these areas. Allotted land is land "owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation."Felix S. Cohen, Handbook of Federal Indian Law 40 (1982). Dependent Indian communities include "those tribal Indian communities under federal protection that did not originate in either a federal or tribal act of 'reserving,' or were not specifically designated a reservation." Id. at 38.
 
 
 18
 Some commenters claimed that the Act precludes tribal regulation in the form of TIPs in non-reservation areas. These parties argued that the section of the Act authorizing TIPs includes a specific provision limiting such regulation within reservations lands. See 42 U.S.C. S 7410(o) (providing that TIPs "shall become applicable to all areas ... located within the exterior boundaries of the reservation"). EPA, however, interpreted "reservation" in § 7410(o) to be "simply a description of the type of area over which a TIP may apply," and ruled that "the provision was [not] intended to limit the scope of TIPs to reservations." Tribal Authority Rule, 63 Fed. Reg. at 7259. EPA's ruling was informed by S 7601(d)(1) under which the Agency "decided to include most of the provisions of [§ 7410] in the group of provisions for which treatment of tribes in the same manner as a state is appropriate." Id.
 
 
 19
 The final aspect of the Tribal Authority Rule under review relates to the provisions covering judicial review of permitting programs. Title V of the Act authorizes regulating authorities to establish permitting programs for pollution sources. Section 7661a(b)(6) requires the authority to afford "an opportunity for judicial review in State court of the final permit action." 42 U.S.C. S 7661a(b)(6). In its proposed rule, EPA indicated an intention to treat tribes like states with respect to judicial review. See Proposed Tribal Authority Rule, 59 Fed. Reg. at 43,972. In its final rule, EPA withdrew this proposal, requiring instead that, for Title V programs, tribes must meet all of the requirements of § 7661a(b)(6) and (7) "except those provisions that specify that review of final action under the Title V permitting program be 'judicial' and 'in State court.' " Tribal Authority Rule, 63 Fed. Reg. at 7261. EPA adopted this provision in response to concerns over tribal sovereign immunity. See id. Thus, EPA indicated its willingness "to consider alternative options, developed and proposed by a tribe in the context of a tribal CAA Title V program submittal, that would not require tribes to waive their sovereign immunity to judicial review but, at the same time, would provide for an avenue for appeal of tribal government action or inaction to an independent review body and for injunctive-type relief to which the Tribe would agree to be bound." Id. at 7262.
 
 
 20
 Petitioner Arizona Public Service Company ("APS") filed a petition for review on April 10, 1998. The remaining petitions for review were filed shortly thereafter; the petitions were subsequently consolidated for consideration by this court.
 
 II. ANALYSIS
 
 21
 Petitioners raise several challenges to EPA's final rule. First, petitioners claim that the 1990 Amendments cannot be interpreted to constitute an express delegation of authority to Native American nations to regulate privately owned fee land located within a reservation. Second, petitioners argue that EPA impermissibly interpreted the word "reservation" to include lands held in trust and Pueblos. Third, petitioners contend that EPA impermissibly interpreted the Act to permit Native American nations to issue TIPs and redesignations for land outside the boundaries of a reservation. Fourth, petitioners assert that EPA has failed to allow public comment on tribal applications to issue regulations under the Act. Fifth, petitioners argue that EPA's interpretation of the 1990 Amendments effectively abrogates preexisting agreements between tribes and regulated industry. Finally, petitioners contend that EPA's final rule covering judicial review procedures for Title V programs was promulgated with insufficientnotice to affected parties and that it rests on an impermissible interpretation of the Act.
 
 
 22
 We analyze EPA's interpretation of the Act under familiar principles. "Where congressional intent is ambiguous, ... an agency's interpretation of a statute entrusted to its administration is entitled to deference, so long as it is reasonable." Shell Oil Co. v. EPA, 950 F.2d 741, 747 (D.C. Cir. 1992) (per curiam) (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)). Our primary concern under Chevron is to ensure that an agency acts within the bounds of congressional delegation. "[A]s long as the agency stays within [Congress'] delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." Arent v. Shalala, 70 F.3d 610, 615 (D.C. Cir. 1995).
 
 
 23
 In evaluating the extent of congressional delegation, a reviewing court first exhausts the traditional tools of statutory construction to determine whether a congressional act admits of plain meaning. See Bell Atlantic Tel. Cos. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997). If, in light of its text, legislative history, structure, and purpose, a statute is found to be plain in its meaning, "then Congress has expressed its intention as to the question, and deference is not appropriate." Id. If congressional intent is ambiguous, then we move to the second step of the Chevron analysis, and uphold an agency's interpretation if it is reasonable. The reasonableness prong includes an inquiry into whether the agency reasonably filled a gap in the statute left by Congress. See United Techs. Corp. v. EPA, 821 F.2d 714, 723 (D.C. Cir. 1987) (upholding filling of gap that is rational and "not inconsistent" with amendments to the Resource Conservation and Recovery Act of 1976).
 
 
 24
 A. Express Delegation of Authority to Native American Nations
 
 
 25
 It is undisputed that Native American nations retain significant sovereign power. Native American nations have inherent power to determine forms of tribal government, to determine tribal membership, to make substantive criminal and civil laws governing internal matters, to administer tribal judicial systems, to exclude others from tribal lands, and, to some extent, to exercise civil jurisdiction over nonmembers, including non-Indians. See Cohen, Handbook of Federal Indian Law, at 247-53; Montana v. United States, 450 U.S. 544, 564 (1981). It is this last category of power that is at issue in the instant case, because petitioners claim that the 1990 Amendments to the Act do not authorize tribes to administer the Act over fee land within a reservation that is owned by nonmembers. As the Supreme Court has held,
 
 
 26
 exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.
 
 
 27
 Montana, 450 U.S. at 564.
 
 
 28
 There is no doubt that tribes hold "inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Id. at 565. For instance, if the behavior of non-Indians on fee lands within the reservation "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," the tribe may regulate that activity. Id. at 566. To satisfy this standard, however, a tribe must show, on a case-by-case basis, that the disputed activity constitutes a "demonstrably serious" impact that "imperil[s] the political integrity, the economic security, or the health and welfare of the tribe." Brendale v. Confederated Tribes and Bands of theYakima Indian Nation, 492 U.S. 408, 431 (1989) (plurality opinion). EPA suggests, not implausibly, that "inherent sovereign power" may apply to tribal regulation under the Act of fee lands within a reservation, see Proposed Tribal Authority Rule, 59 Fed. Reg. at 43,598 n.5, but the Agency does not press this argument on appeal. Rather, EPA contends that the 1990 Amendments constitute an express congressional delegation to the tribes of the authority to regulate air quality on fee lands located within the exterior boundaries of a reservation.
 
 
 29
 "There are few examples of congressional delegation of authority to tribes." Cohen, Handbook of Federal Indian Law, at 253. However, as is the case in any situation in which we are called upon to find congressional intent in construing a contested statute, we start with traditional sources of statutory interpretation, including the statute's text, structure, purpose, and legislative history. See, e.g., Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984) ("Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."). Our review of the CAA indicates that EPA's interpretation comports with congressional intent.
 
 
 30
 Section 7601(d), in pertinent part, authorizes EPA to treat otherwise eligible tribes as states if "the functions to be exercised by the Indian tribe pertain to the management and protection of air resources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction."42 U.S.C. S 7601(d)(2)(B). The statute's clear distinction between areas "within the exterior boundaries of the reservation" and "other areas within the tribe's jurisdiction" carries with it the implication that Congress considered the areas within the exterior boundaries of a tribe's reservation to be per se within the tribe's jurisdiction. Thus, EPA correctly interpreted S 7601(d) to express congressional intent to grant tribal jurisdiction over nonmember owned fee land within a reservation without the need to determine, on a case-specific basis, whether a tribe possesses "inherent sovereign power" under Montana.
 
 
 31
 Petitioners do not dispute that an important purpose of the Act is to ensure effective enforcement of clean air standards. Obviously, this is best done by allowing states and tribes to establish uniform standards within their boundaries. As EPA explained in its proposed rule,
 
 
 32
 [a]ir pollutants disperse over areas several and some-times even hundreds of miles from their source of origin, as dictated by the physical and chemical properties of the pollutants at issue and the prevailing winds and othermeteorological conditions. The high mobility of air pollutants, resulting area wide effects and the seriousness of such impacts, underscores the undesirability of fragmented air quality management within reservations.
 
 
 33
 Proposed Tribal Authority Rule, 59 Fed. Reg. at 43,959.
 
 
 34
 Accepting petitioners' interpretation of the 1990 Amendments would result in a "checkerboard" pattern of regulation within a reservation's boundaries that would be inconsistent with the purpose and provisions of the Act. Indeed, the Supreme Court has condemned such an approach. See Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 479 (1976) (rejecting checkerboard approach in interpreting S 6 of the General Allotment Act, 25 U.S.C. S 349); Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 358 (1962) (terming "impractical" a pattern of checkerboard jurisdiction under 18 U.S.C. S 1151).
 
 
 35
 Finally, we note that the legislative history of the 1990 Amendments supports EPA's interpretation. As originally introduced, 42 U.S.C. S 7601(d) differed in significant respect from the final adopted version. The original S 7601(d)(2)(B) provided that treatment of tribes as states was authorized if "the functions to be exercised by the Indian tribe are within the area of the tribal government's jurisdiction." S. 1630, 101st Cong. S 113(a) (1990), reprinted in Senate Comm. on Env't and Pub. Works, 103d Cong., Legislative History of the Clean Air Act Amendments of 1990, at 4283 (1993) (emphasis added); see also H.R. 2323, 101st Cong. S 604 (1989), reprinted in Legislative History of the Clean Air Act Amendments of 1990, at 4101. The statute as finally enacted, however, treats tribes and states as equivalent if the tribe is to exercise functions "within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction." 42 U.S.C. S 7601(d)(2)(B).
 
 
 36
 Thus, Congress moved from authorizing tribal regulation over the areas "within the tribal government's jurisdiction" (an admittedly general category) to a bifurcated classification of all areas within "the exterior boundaries of the reservation" and "other areas within the tribe's jurisdiction." This change strongly suggests that Congress viewed all areas within "the exterior boundaries of the reservation" to be "within the area of the tribal government's jurisdiction." The change also indicates that Congress knew how to draft the 1990 Amendments to support petitioners' interpretation. The fact that Congress specifically rejected language favorable to petitioners' position and enacted instead language that is consistent with EPA's interpretation only strengthens our conclusion that the Agency has correctly ascertained Congress' intent in passing the 1990 Amendments.
 
 
 37
 The dissent's contrary contentions regarding the meaning of the 1990 Amendments do not cause us to question this conclusion. The dissent's argument that Congress would not use a "never-before-attempted" formulation to accomplish an express delegation when it could use the "formulaic 'notwithstanding' proviso [used in S 7410(o)]--the gold standard for such delegations," cannot carry much weight. Dissent Op. at 5-6. That a provision uses a new formulation is not dispositive of the question as to whether it constitutes an express delegation. Indeed, it is noteworthy that, in construing 33 U.S.C. S 1337(h)(1), which uses the dissent's so-called "gold standard," EPA has declined to find an express delegation in such language. We can assume that Congress was aware of EPA's contemporaneous interpretation of the Clean Water Act, first proposed in 1989 (while Congress contemplated the 1990 Amendments). See Amendments to the Water Quality Standards Regulations That Pertain to Standards on Indian Reservations, 54 Fed. Reg. 39,098, 39,101 (1989) (proposed Sept. 22, 1989) (to be codified at 40 C.F.R. pt. 131) ("EPA may treat an Indian Tribe as a State ... only where the Tribe already possesses and can adequately demonstrate authority to manage and protect water resources within the borders of the reservation. The Clean Water Act ... does not grant additional authority to Tribes."). Thus, Congress' failure to use the same language in § 7601(d) does not at all imply that it meant to avoid delegation to the tribes; rather, it may suggest just the opposite.
 
 
 38
 The dissent's argument resting on Congress' omission of a "literal delegation" to tribes is seductive, but, ultimately, also unconvincing. It is true that, as originally introduced, the bills in the Senate and the House contained language providing that "the Administrator ... may delegate to [ ] tribes [that the Administrator is authorized to treat as States] primary responsibility for assuring air quality and enforcement of air pollution control." H.R. 2323, 101st Cong. S 604 (1989), reprinted in Legislative History of the Clean Air Act Amendments of 1990, at 4101. The absenceof this language from the final bill, however, does not compel the dissent's conclusion that Congress "specifically rejected" language favorable to EPA's position. Neither the majority nor the dissent can call upon determinative legislative history to illuminate the motivations behind this unexplained change to the provisions at issue. We suggest, however, that there are at least two other explanations that account for the absence of the cited language from the final bill. First, Congress simply may have deemed the language to be redundant and confusing in light of S 7601(d)(2)(B). It would have been redundant because S 7601(d)(2)(B) already accomplishes an express delegation. It would have been confusing because the omitted language can be read to apply to areas both outside and inside the boundaries of the reservation, and, as we hold, Congress intended to expressly delegate only with respect to areas within the boundaries of a reservation.
 
 
 39
 Second, the language contained in the original bills hardly represents, as the dissent declares ipse dixit, a "literal delegation." Providing that the "Administrator ... may delegate" authority to tribes reads less like an express delegation from Congress to the tribes than a permissive instruction to the Administrator. Moreover, the omitted language did not expressly expand tribal jurisdiction to include those areas within the boundaries of a reservation owned by nonmembers--which is what is necessary for express delegation--as does the language in the adopted S 7601(d)(2)(B).In other words, the language used in the progenitors to S 7601(d) that the dissent claims is a "literal delegation" is not easily manipulated to fit the contours of the traditional express delegation inquiry. We also note, as an aside, that by treating the original bills' language as an express delegation, our colleague seemingly abandons the "gold standard" that he claims Congress consistently has utilized expressly to delegate authority to Indian tribes. In short, we take more from the language used in the adopted S 7601(d)(2)(B) than from the language omitted.
 
 
 40
 What little precedent there is addressing express delegations of authority to Native American nations in other contexts supports our interpretation of § 7601(d). In United States v. Mazurie, the Supreme Court reviewed 18 U.S.C. S 1161 and concluded that the statute was an express delegation to tribes of the authority to regulate alcohol transactions.419 U.S. 544, 556-57 (1975). The Court reaffirmed this holding almost a decade later. See Rice v. Rehner, 463 U.S. 713, 728-29 (1983). Section 1161 provides in pertinent part that various federal liquor laws applicable to transactions within Indian country shall not apply
 
 
 41
 within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.
 
 
 42
 18 U.S.C. S 1161 (1994). The Court read this language to make
 
 
 43
 clear that Congress contemplated that its absolute but not exclusive power to regulate Indian liquor transactions would be delegated to the tribes themselves, and to the States, which historically shared concurrent jurisdiction with the Federal Government in this area.
 
 
 44
 Rehner, 463 U.S. at 728-29.
 
 
 45
 The decisions in Mazurie and Rehner are significant because the Court found an express delegation despite the absence of any "we hereby delegate" language in the statute.The Court did not find any precise language of delegation in the disputed statute, but, rather, rested on the implication inherent in recognizing the power of tribes to adopt an ordinance pertinent to liquor transactions on Indian country. See Rehner, 463 U.S. at 730-31.Similarly, in this case, we find an express congressional delegation from the implication inherent in the distinction between areas "within the exterior boundaries of the reservation" and "other areas within the tribe's jurisdiction."
 
 
 46
 Petitioners claim that the 1990 Amendments delegate authority to EPA to approve state or tribal air quality programs for federal enforcement, not authority to tribes to "adopt regulatory programs that the tribes could not adopt under tribal and federal Indian law prior to the 1990 Amendments." Br. for Petitioners National Ass'n of Mfrs. ("NAM") at 23.Petitioners' claim misses a crucial point, however, that there are two different powers at issue here: (1) the authority to regulate and (2) the derivative authority to enforce specific provisions of the Act. Petitioners focus on the derivative authority. Of course the 1990 Amendments do not constitute an express delegation to the tribes to enact regulatory provisions absent any federal oversight or approval. Rather, the 1990 Amendments simply establish the palette with which tribes are permitted to paint their regulatory picture.
 
 
 47
 Petitioners additionally argue that although states are authorized under 42 U.S.C. S 7407(a) to enact programs "within the entire geographic area comprising such State," EPA has never interpreted this provision as allowing states to promulgate air quality regulations applicable to Native American reservations located within a state's geographic area. In other words, petitioners claim that because states may not promulgate regulations affecting Native American reservations, tribes may not promulgate regulations covering lands held in fee by persons other than tribal members. This argument is obviously flawed, because it fails to recognize that the relationship between fee holders and tribes is quite different from the relationship between tribes and states. As the Supreme Court noted in Mazurie, Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory; they are "a separate people" possessing "the power of regulating their internal and social relations...."
 
 
 48
 419 U.S. at 557 (citations omitted). And there is no doubt that Congress may delegate authority to tribes "even though the lands [are] held in fee by non-Indians, and even though the persons regulated [are] non-Indians." Id. at 554.
 
 
 49
 Finally, petitioners note that the Agency declined to find an express delegation of power to regulate fee lands under SS 518(e) and (h) of the Clean Water Act; this is noteworthy to petitioners, because they can glean no difference between the cited provisions under the Clean Water Act and the disputed provisions in this case under the Clean Air Act. We find no merit in this argument. The Clean Water Act states that "[t]he Administrator is authorized to treat an Indian tribe as a State ... if ... the functions to be exercised by the Indian tribe pertain to the management and protection of water resources which are held by an Indian tribe ... within the borders of an Indian reservation." 33 U.S.C. S 1377(e)(2) (1994). "Reservation" is defined as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation." Id. S 1377(h)(1). In construing these provisions, EPA concluded that because the legislative history was "ambiguous and inconclusive," it would not find that the Clean Water Act expanded or limited the scope of tribal authority beyond that inherent in the tribe. Amendments to the Water Quality Standards Regulation That Pertain to Standards on Indian Reservations, 56 Fed. Reg. 64,876, 64,880 (1991) (codified at 40 C.F.R. pt. 131).
 
 
 50
 The situation here is quite different from what EPA found with respect to the lean Water Act. Although the disputed language in the Clean Air Act and theClean Water Act is somewhat similar, it is far from identical. As noted above, EPA correctly relied on the CAA's clear distinction between areas "within the exterior boundaries of the reservation" and "other areas within the tribe's jurisdiction" to find a congressional intention to define the areas within the exterior boundaries of a tribe's reservation to be per se within the tribe's jurisdiction. Furthermore, as we have already indicated, the legislative history of the 1990 Amendments plainly supports EPA's interpretation. Thus, the legislative history underlying the Clean Air Act is not "ambiguous and inconclusive," as was found to be the case with respect to the Clean Water Act.
 
 
 51
 It is also of some significance that EPA's interpretation of the Clean Water Act never has been subject to judicial review on the question of the presence or absence of an express delegation to tribes to regulate fee lands within the bounds of reservations. One federal court has observed, in dicta, that "the statutory language [in the Clean Water Act] seems to indicate plainly that Congress did intend to delegate ... authority to tribes." State of Montana v. EPA, 941 F. Supp. 945, 951 (D. Mont. 1996). The court noted, however, that in construing the provisions of the Clean Water Act, "EPA determined that it would take the more cautious view, that Congress did not expressly delegate jurisdiction to tribes over non-Indians and that tribes would have to prove on a case-by-case basis that they possess such jurisdiction." Id. at 952. There was no reason for EPA to take a similarly "cautious view" with respect to the Clean Air Act, because the language and legislative history of the 1990 Amendments differ from that of the Clean Water Act.
 
 
 52
 B. EPA's Interpretation of "Reservation"
 
 
 53
 Given that EPA correctly interpreted S 7601(d) to expressly delegate jurisdiction to otherwise eligible tribes over all land within the exterior boundaries of reservations, including fee land, the next question is what areas are covered by a "reservation." EPA interprets "reservation" as used in three different statutory provisions (42 U.S.C. SS 7410(o), 7474(c), 7601(d)(2)(B)) to mean formally designated reservations as well as "trust lands that have been validly set apart for the use of a tribe even though the land has not been formally designated as a reservation." Tribal Authority Rule, 63 Fed. Reg. at 7258. This includes what EPA terms "Pueblos" and tribal trust land. Pueblos are villages, primarily located in New Mexico, held by tribes in communal fee-simple ownership, originally acquired under grants from Spain and Mexico, and confirmed by Congress in the late 1800s. See United States v. Sandoval, 231 U.S. 28, 38-39 (1913). Petitioners ignore the status of Pueblos and concentrate their attack on EPA's interpretation of "reservation" to include tribal trust land.
 
 
 54
 The Secretary of the Interior is authorized to acquire land in trust for a tribe under 25 U.S.C. S 465 (1994), and such land can only formally be designated a reservation via the process provided by 25 U.S.C. S 467 (1994). Petitioners claim that EPA's interpretation contravenes the Act's plain language and renders 25 U.S.C. S 467 superfluous by ignoring the distinction between "trust lands" and "reservations." EPA counters that the statute is ambiguous, and that its reasonable interpretation is entitled to Chevron deference.
 
 
 55
 We start with Chevron step one and rely on traditional principles of statutory construction to determine whether EPA's interpretation contravenes congressional intent as manifested by the 1990 Amendments. Significantly, the Act nowhere defines "reservation." Therefore, we look to the term's ordinary and natural meaning, and the context in which the term is used. See Smith v. United States, 508 U.S. 223, 228-30 (1993). And we must remain cognizant of the rule that courts construe federal statutes liberally to benefit NativeAmerican nations. See Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).
 
 
 56
 The dictionary defines "reservation" to be a "tract of public land set aside for a particular purpose (as schools, forest, or the use of Indians)." Webster's Third New Int'l Dictionary 1930 (1993). This definition surely encompasses both trust lands and formally designated reservations. Nothing in the United States Code is clearly to the contrary, for the term "reservation" has no rigid meaning as suggested by petitioners. See 7 U.S.C. S 1985(e)(1)(A)(ii) (Supp. IV 1998) (defining "reservation" to include land "within the limits of any Indian reservation under the jurisdiction of the United States, ... trust or restricted land located within the boundaries of a former reservation of a federally recognized Indian tribe in the State of Oklahoma[,] ... [and] all Indian allotments the Indian titles to which have not been extinguished if such allotments are subject to the jurisdiction of a federally recognized Indian tribe"); id. S 2012(j) (1994) (defining "reservation" as "the geographically defined area or areas over which a tribal organization ... exercises governmental jurisdiction"); 25 U.S.C. S 1452(d) (1994) (defining "reservation" to include Indian reservations, public domain Indian allotments, former Indian reservations in Oklahoma, and land held by incorporated Native groups, regional corporations, and village corporations under the provisions of the Alaska Native Claims Settlement Act); id. § 1903(10) (1994) (defining "reservation" to be "Indian country as defined in section 1151 of Title 18" and any trust land not encompassed by S 1151); id. S 3103(12) (1994) (" '[R]eservation' includes Indian reservations established pursuant to treaties, Acts of Congress or Executive orders, public domain Indian allotments, and former Indian reservations in Oklahoma"); 33 U.S.C. S 1377(h)(1) (defining "Federal Indian reservation" to mean "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation").
 
 
 57
 These varying definitions of "reservation" lay to waste petitioners' argument. Petitioners appear to assert that, in the absence of any specific definition, "reservation" as used in the 1990 Amendments to the Act can only mean the formal reservation contemplated by 25 U.S.C. S 467. This is a specious contention. First, S 467 does not purport to offer an exclusive definition of "reservation"; it simply defines the terms under which federal land is formally designated a reservation. Second, if Congress had wanted to limit the term "reservation" as petitioners suggest, Congress could have done so. Indeed, Congress on many occasions has defined "reservation" in terms of other statutes. See 12 U.S.C. S 4702(11) (1994) (defining "reservation" according to 25 U.S.C. S 1903(10)); 22 U.S.C. S 2124c(m)(1) (1994) (defining "Indian reservation" with reference to 25 U.S.C. S 1452(d)); 25 U.S.C. S 1903(10) (defining "reservation" with reference to 18 U.S.C. S 1151, as well as trust land); 26 U.S.C. S 168(j)(6) (1994 & Supp. III 1997) (defining "Indian reservation" with reference to 25 U.S.C. S 1452(d) and 25 U.S.C. S 1903(10)); 42 U.S.C. S 10101(19) (1994) (defining "reservation" to include communities referred to in 18 U.S.C. S 1151(a), (b)); id. S 11332(a) (1994) (defining "reservation" according to 25 U.S.C. S 1452(d)). Moreover, given the varying definitions of the term used throughout the Code, it would be a curious result indeed for this court to insist that the absence of a definition requires EPA to advance the most restrictive definition as put forth by petitioners.
 
 
 58
 Aside from the statute's plain meaning and its context, other sources of statutory interpretation offer no insight into congressional intent with respect to the meaning of "reservation." The Report of the Senate Committee on Environment and Public Works refers to the authority ofIndian tribes to "administer and enforce the Clean Air Act in Indian lands," as well as enforcement of the Act in "Indian country." S. Rep. No. 101-228, at 79, 80 (1989), reprinted in Legislative History of the Clean Air Act Amendments of 1990, at 841920. These terms are arguably broader than the definition of "reservation" urged by petitioners, and simply confirm the term's ambiguity as used by Congress.
 
 
 59
 Accordingly, we turn to step two of the Chevron inquiry. That is, did the Agency reasonably interpret the term "reservation" to include formal reservations, Pueblos, and trust lands? EPA supported its interpretation of "reservation" by looking to relevant case law, in particular Supreme Court precedent holding that there is no relevant distinction between tribal trust land and reservations for the purpose of tribal sovereign immunity. See Oklahoma Tax Comm'n, 498 U.S. at 511. This view is consonant with other federal court holdings that an Indian reservation includes trust lands. See United States v. John, 437 U.S. 634, 649 (1978) (finding "no apparent reason" why lands held in trust should not be considered a "reservation" under S 1151(a)); HRI, Inc. v. EPA, 198 F.3d 1224, 1249-54 (10th Cir. 2000) (same); United States v. Azure, 801 F.2d 336, 339 (8th Cir. 1986) (considering tribal trust land to be Indian country under either S 1151(a) as a "de facto" reservation or S 1151(b) as a dependent Indian community); United States v. Sohappy, 770 F.2d 816, 822-23 (9th Cir. 1985) (holding that trust land is a "reservation" under S 1151(a)).
 
 
 60
 Petitioners note that, for several years, EPA has defined reservation, for the purposes of the PSD program, to be "any federally recognized reservation established by Treaty, Agreement, executive order, or act of Congress." 40 C.F.R. 52.21(b)(27) (1999). Given the Agency's reasoned justification for a broader definition of "reservation" in the Tribal Authority Rule, and its proposal to amend the PSD definition to ensure consistency with the Tribal Authority Rule, EPA's departure from the PSD definition does not preclude this court from upholding EPA's new definition. In light of the ample precedent treating trust land as reservation land in other contexts, and the canon of statutory interpretation calling for statutes to be interpreted favorably towards Native American nations, we cannot condemn as unreasonable EPA's interpretation of "reservations" to include Pueblos and tribal trust land.
 
 
 61
 C. Areas over which Tribes May Exercise Jurisdiction to Propose TIPs and Redesignations
 
 
 62
 The next issue that arises in this case is whether EPA defensibly interprets the extent of Native American authority to redesignate geographic areas and propose TIPs under the Act. Native American nations are authorized to redesignate "[l]ands within the exterior boundaries of reservations of federally recognized Indian tribes." 42 U.S.C. S 7474(c).Similarly, Indian tribes may submit TIPs "applicable to all areas ... located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation." 42 U.S.C. S 7410(o).
 
 
 63
 EPA interpreted both of these provisions to authorize tribal redesignation and implementation of TIPs not just within the limits of reservations (including trust lands and Pueblos), but also within allotted lands and dependent Indian communities. No one argues that allotted lands and dependent Indian communities are within the compass of a "reservation." Instead, EPA contends that so long as a tribe demonstrates inherent jurisdiction over non-reservation areas, it may issue redesignations and TIPs for those lands. In other words, although tribes do not have express delegated authority to issue redesignations and TIPs for nonreservation areas, neither does the Act bar tribes from acting on acase-by-case basis pursuant to demonstrated inherent sovereign power.
 
 
 64
 Petitioners contend that both S 7474(c) and 7410(o) operate as geographical limitations on the power of tribes to redesignate areas and issue TIPs. Petitioners' argument with respect to S 7474(c) falls flat. This provision says that "[l]ands within the exterior boundaries of reservations of federally recognized Indian tribes may be redesignated only by the appropriate Indian governing body." 42 U.S.C. S 7474(c). Petitioners seek to twist this language into the following: "Indian tribes may only redesignate lands within the exterior boundaries of reservations." All S 7474(c) establishes, however, is the exclusive power of Indian tribes to redesignate land within a reservation; it does not address the inherent power of tribes to redesignate land in nonreservation areas.
 
 
 65
 Nor do petitioners fare better with respect to S 7410(o), which states that EPA-approved TIPs "shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation." 42 U.S.C. S 7410(o). Petitioners read this to mean that EPA may only approve a TIP if it applies within reservation areas. As EPA points out, petitioners' interpretation cannot stand for several reasons. First, S 7410(o) cross-references S 7601(d), which allows for tribes to exercise jurisdiction over reservation areas or "other areas within the tribe's jurisdiction." 42 U.S.C. S 7601(d)(2)(B). Most importantly, S 7410(o) provides that TIPs apply to all areas within the borders of a reservation once the plan "becomes effective in accordance with the regulations promulgated under section 7601(d) of this title."42 U.S.C. S 7410(o). Therefore, it is permissible for EPA to give § 7410(o) the reading it proffers: a reinforcement of tribes' jurisdiction to implement TIPs in reservation land. Petitioners would instead read the statute as an express limitation of tribal jurisdiction. Under step one of Chevron, we cannot say that congressional intent is free of ambiguity on this question.
 
 
 66
 Accordingly, we turn to whether EPA's interpretation is reasonable. We believe that it is undoubtedly so. To read the statute otherwise would result in several anomalies. First, EPA notes without dispute that petitioners' interpretation would allow a state's implementation plan to apply to non-reservation areas, even where a tribe has demonstrated inherent jurisdiction over those areas. Second, petitioners' reading would disable a tribe from comprehensively administering the Act. A tribe could implement, in non-reservation areas, new source performance standards under the Act, but not administer a TIP, even though the regulated activity "threatens or has some direct effect on the ... health or welfare of the tribe." Montana, 450 U.S. at 566. EPA's reading of the statute to allow such regulation is a reasonable interpretation of SS 7410(o) and 7601(d).
 
 
 67
 D. The Right of The Public To Comment on Tribal Applications to Regulate
 
 
 68
 EPA's final rule limited the opportunity of the public to comment directly to the Agency on "competing claims over tribes' reservation boundary assertions and assertions of jurisdiction over non-reservation areas," allowing only "appropriate governmental entities" to submit comments. Tribal Authority Rule, 63 Fed. Reg. at 7267. Petitioners challenge this limitation of the public's opportunity to comment directly to EPA. Before this court, however, EPA indicated its intent to clarify that the Agency will accept comments directly from all commenters on the determination of a tribe's eligibility to be treated as a state. See Br. for Respondent at 43. Subsequently, EPA issued a clarification to this effect. See Indian Tribes: Air Quality Planning and Management, 65 Fed. Reg. 1322, 1323 (2000).
 
 
 69
 Therefore, this issue is moot. See Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 458 (D.C. Cir. 1998) (finding challenge to EPA's waiver for state's program was moot where actions complained of were revised after lawsuit was filed). A dispute may be rendered moot where the complained of conduct has been voluntarily discontinued if "(1) there is no reasonable expectation that the conduct will recur and (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.' " Id. at 459 (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). In this case, there is no indication that EPA will revert to its past proposal only to receive direct comments from "appropriate governmental units," and all of the adverse effects of the Agency's alleged illegal action have been remedied by EPA's clarification.
 
 
 70
 E. Abrogation of Existing Agreements By Tribes Not to Regulate Certain Land
 
 
 71
 Petitioners argue that EPA's final rule abrogates preexisting agreements by Native American nations not to regulate certain individual parties. Specifically, petitioner APS points to its 1960 lease with the Navajo Nation that APS claims prohibits the Nation from regulating the operation of the Four Corners Power Plant. See Br. of Petitioner APS at 2.APS further claims that the Secretary of the Interior covenanted to protect APS from tribal regulation. See id. at 3.
 
 
 72
 Petitioners point to footnote 5 in the final rule which states, in response to industry comments that preexisting agreements may limit the extent of a tribe's regulatory jurisdiction, that "EPA believes that the CAA generally would supersede pre-existing treaties or binding agreements that may limit the scope of tribal authority over reservations." Tribal Authority Rule, 63 Fed. Reg. at 7256 n.5. Petitioners ignore the sentence following footnote 5, however, in which EPA states that it "will consider on a case-by-case basis whether special circumstances exist that would prevent a tribe from implementing a CAA program over its reservation." Id. at 7256 (emphasis added). EPA maintains in its brief that it has made no judgment on the scope and effect of the specific agreements to which petitioners refer, and that it will consider such questions as they arise. As counsel for APS acknowledged at oral argument, it is quite possible that the abrogation issue never will arise. For instance, if the Navajo Nation agrees that it will not regulate the Four Corners Plant, there will be no controversy in need of resolution.
 
 
 73
 There is still a concern, however. In EPA's preamble to a proposed federal implementation plan, promulgated after the Tribal Authority Rule, the Agency stated that,
 
 
 74
 [u]pon review of the circumstances surrounding the location and operation of [the Four Corners Power Plant] on the Navajo Indian Reservation, EPA concluded that jurisdiction under the Act over this facility lies with EPAand the Navajo Nation.
 
 
 75
 64 Fed. Reg. 48,731, 48,732 (1999); see also 64 Fed. Reg. 48,725, 48,726 (1999) (taking same position with respect to the Navajo Generating Station). EPA now acknowledges that, to the extent these preambles imply that the Agency has determined that the indicated plants are subject to regulation by the Navajo Nation, these statements were incorrect. See Supp. Br. of Respondent at 4. In fact, EPA has confirmed this position by publishing an official notice in the Federal Register clearly indicating that it has not yet determined whether the Navajo Nation may regulate the indicated power plants under the Act. See id. at 4-5.
 
 
 76
 This issue, therefore, is not ripe for review before this court. The ripeness doctrine seeks to balance institutional interests in delaying review against litigants' interests in promptly reviewing allegedly unlawful government actions. See FloridaPower & Light Co. v. EPA, 145 F.3d 1414, 142021 (D.C. Cir. 1998). First a court must ask if the disputed issues are fit for judicial review. See Abbot Labs. v. Gardner, 387 U.S. 136, 149 (1967). If the institutional interests of the agency or reviewing court favor postponing review, then a party must demonstrate "hardship" in order to show that the issue should nonetheless be made subject to judicial review. See City of Houston v. HUD, 24 F.3d 1421, 1431 (D.C. Cir. 1994).
 
 
 77
 The fitness inquiry asks if a case " 'presents a concrete legal dispute [and] no further factual development is essential to clarify the issues ... [and] there is no doubt whatever that the challenged [agency] practice has "crystallized" sufficiently for purposes of judicial review.' " Rio Grande Pipeline Co. v. FERC, 178 F.3d 533, 540 (D.C. Cir. 1999) (quoting Payne Enters., Inc. v. United States, 837 F.2d 486, 492-93 (D.C. Cir. 1988)) (alterations in original). Here, petitioners cannot satisfy this prong because EPA has not issued any order relating to the preexisting covenants prohibiting regulation by Native American nations. See Florida Power & Light, 145 F.3d at 1421 (finding lack of fitness for review where it was unclear "whether, or on what grounds, EPA would even apply" the challenged rule to petitioners).
 
 
 78
 Additionally, petitioners cannot point to any hardship they would suffer from deferred judicial review. It is axiomatic that mere delay, absent other extenuating circumstances, in adjudication of a dispute cannot satisfy the hardship prong. See Clean Air Implementation Project v. EPA, 150 F.3d 1200, 1205-06 (D.C. Cir. 1998); Florida Power & Light, 145 F.3d at 1421 (burden of participating in further proceedings does not constitute a hardship).
 
 
 79
 Contrary to petitioners' argument, this case is not on all fours with Better Government Association v. Department of State, 780 F.2d 86 (D.C. Cir. 1986). In Better Government, petitioners challenged Department of Justice regulations applied by the Department of State and the Department of the Interior to evaluate fee waiver applications for Freedom of Information Act requests. The court found that the claim was ripe for review because the departments relied on the Department of Justice guidelines, and the government agreed that the regulations "govern[ ] and will continue to govern its decisions." Id. at 93. Here, EPA has made no decision that will govern its analysis of whether the preexisting agreements are abrogated by its interpretation of the Act. Until the Agency takes a position on the enforceability of the covenants not to regulate, there is no concrete issue for this court to consider.
 
 
 80
 F. Judicial Review of Tribal Permitting Programs
 
 
 81
 Under Title V of the Act, states must develop a comprehensive permitting program applicable to major air pollution sources. See 42 U.S.C. S 7661a. Section 7661a enunciates the requirements for administering permitting programs, including elements of judicial review. Pursuant to § 7661a,
 
 
 82
 [t]hese elements shall include ...
 
 
 83
 (6) Adequate, streamlined, and reasonable procedures for ... expeditious review of permit actions, ... including an opportunity for judicial review in State court of the final permit action....
 
 
 84
 (7) To ensure against unreasonable delay by the permit-ting authority, adequate authority and procedures to provide that a failure of such permitting authority to acton a permit application or permit renewal application ...shall be treated as a final permit action solely for purposes of obtaining judicial review in State court of an action brought by any person referred to in paragraph(6) to require that action be taken by thepermitting authority on such application without additional delay. Id. § 7661a(b)(6), (7).
 
 
 85
 EPA initially proposed that tribes "will have to meet the same requirements" as states in providing an opportunity for judicial review of a final permit action. Proposed Tribal Authority Rule, 59 Fed. Reg. at 43,972. EPA withdrew this proposal in its final rule. Instead, EPA required tribes to meet all the requirements of S 7661a(b)(6) and (7) except that review of a tribe's Title V permitting program need not be "judicial" or "in State court." See Tribal Authority Rule, 63 Fed. Reg. at 7261. Petitioners present two challenges to the final rule on judicial review: (1) that EPA had no authority to exempt tribes from the Act's judicial review requirements; and (2) that interested parties received insufficient notice of the final rule's content.
 
 
 86
 EPA promulgated its final rule in response to comments that expressed concern over "waivers of tribal sovereign immunity to judicial review." Id. Some Native American representatives observed that requiring a waiver of sovereign immunity for a tribe to administer a Title V permit program would operate as a disincentive to a tribe's establishing such programs. Industry commenters also sought assurances that nonmembers of tribes would have access to tribal courts for judicial review.
 
 
 87
 EPA identified two alternatives for ensuring that "some form of citizen recourse be available for applicants and other persons affected by permits issued under tribal Title V programs." Id. One option was for tribes to voluntarily waive their sovereign immunity in tribal courts. A second possibility was for the Agency to consider "alternative options ...that would not require tribes to waive their sovereign immunity to judicial review but, at the same time, would provide for an avenue for appeal of tribal government action or inaction to an independent review body and for injunctive type relief to which the Tribe would agree to be bound." Id. at 7262. EPA interpreted 42 U.S.C. § 7601(d) to "provide[ ] EPA with the discretion to balance the goals of ensuring meaningful opportunities for public participation under the CAA and avoiding undue interference with tribal sovereignty when determining those provisions for which it is appropriate to treat tribes in the same manner as states." Id.
 
 
 88
 Section 7601(d) authorizes EPA to treat Native American nations as states for the purposes of the Act. However, if EPA determines "that the treatment of Indian tribes as identical to states is inappropriate or administratively infeasible, the Administrator may provide, by regulation, other means by which the Administrator will directly administer such provisions so as to achieve the appropriate purpose." 42 U.S.C. S 7601(d)(4). EPA relies on this statutory provision to justify the approach taken on judicial review.
 
 
 89
 Petitioners argue that EPA lacks authority to exempt tribes from the judicial review requirements, because S 7601(d) does not affect the operation of CAA provisions "that define rights that must be afforded to those affected by a program in order [for either a tribe or a state] to receive EPA approval to administer a federally enforceable program." Br. for Petitioners NAM at 42. We see no merit in this claim. EPA's interpretation is not clearly contradicted by the statute. In fact, S 7601(d)(4) allows the Agency the discretion to determine whether it is "inappropriate or administratively infeasible" to treat Indian tribes exactly the same as states in administering the Act. Petitioners offer no support for their assertions that the judicial review requirements do not come within the EPA's discretion under this section. It is obvious, then, that the Agency had a choice as to whether to treat Indian tribes identical to states with regard to the judicial review elements of S 7661a(b). The clear meaning of the statutedoes not foreclose the Agency's interpretation.
 
 
 90
 Nor is the Agency's interpretation unreasonable. EPA understandably was concerned that the effect of requiring tribes to submit their permitting disputes to state courts would conflict with policies supporting tribal sovereignty and also discourage the institution of tribal permitting programs. The Agency's decision to allow tribes to submit alternatives to waiving sovereign immunity accomplishes a reasonable balancing of these interests. This is bolstered by EPA's expressed intention to ensure that any alternative to a waiver of sovereign immunity nonetheless provides an impartial forum allowing for "injunctive-type relief." Tribal Authority Rule, 63 Fed. Reg. at 7262.
 
 
 91
 Petitioners also argue that, assuming that EPA could exempt tribes from judicial review requirements, S 7601(d)(4) requires that EPA provide an alternative means of ensuring effective judicial review. Petitioners suggest that EPA must at least "provide for review by the Regional Administrator of all tribal permit decisions, and resolve all federal or tribal challenges to the tribe's actions." Br. for Petitioners NAM at 44. To the extent that this argument merely reiterates the contention that EPA has no authority to alter tribes' judicial review responsibilities, nothing more need be said. To the extent that this argument challenges the alternative tribal review procedures to be approved by EPA in lieu of judicial review in state court, this issue is not ripe for review. EPA has not yet approved any alternative tribal judicial review procedures. See Tribal Authority Rule, 63 Fed. Reg. at 7262 ("EPA will develop guidance in the future on acceptable alternatives to judicial review."). As such, there is no decision "fit" for judicial review, nor have petitioners demonstrated any hardship from deferred review.
 
 
 92
 Petitioners advance a separate contention in support of vacating the rule: that interested parties did not receive sufficient notice of the substance of the final rule. The Administrative Procedure Act requires that an agency publish notice of its proposed rulemaking that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. S 553(b)(3) (1994). An agency satisfies this notice requirement if the final rule is a "logical outgrowth" of the proposed rule. See Aeronautical Radio, Inc. v. FCC, 928 F.2d 428, 445-46 (D.C. Cir. 1991). In other words, we consider " 'whether ... [the party], ex ante, should have anticipated that such a requirement might be imposed' " in determining whether adequate notice was given in a notice of proposed rulemaking. Id. at 446 (quoting Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 549 (D.C. Cir. 1983)) (alterations in original).
 
 
 93
 "In most cases, if the agency ... alters its course in response to the comments it receives, little purpose would be served by a second round of comment." American Water Works Ass'n v. EPA, 40 F.3d 1266, 1274 (D.C. Cir. 1994).Thus, the "logical outgrowth" test normally is applied to consider "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule."Id. (emphasis added). In this case, there was more than enough notice for interested parties to offer comments on EPA's treatment of the judicial review provisions of the Act vis a vis Indian tribes. The parties were not asked to "divine the EPA's unspoken thoughts." Shell Oil Co., 950 F.2d at 751. And the final rule was not wholly unrelated or surprisingly distant from what EPA initially suggested. In first proposing that tribes would have to meet the "same requirements" as states, EPA effectively raised the question as to whether this made sense. EPA's proposal was not a "bureaucratic game of hide and seek," MCI Telecomm. Corp. v. FCC, 57 F.3d 1136, 1142 (D.C. Cir. 1995); the proposal raised a highlyvisible and controversial issue and elicited responses from both tribal and industry commenters. Furthermore, any reasonable party should have understood that EPA might reach the opposite conclusion after considering public comments. In short, it is fair to say that the purpose of notice and comment rulemaking has been served, and that the Agency's change of heart on this issue only demonstrates the value of the comments it received.
 
 III. CONCLUSION
 
 94
 Consistent with the foregoing opinion, we deny the petitions for review in part, and dismiss in part for want of jurisdiction and for lack of ripeness. Petitioners' motions for vacatur and remand are dismissed as moot.
 
 GINSBURG, Circuit Judge, dissenting in part:
 
 95
 With certain exceptions, of which more later, an Indian tribe lacks inherent authority to regulate the conduct of a nonmember on land he owns within the boundaries of the tribe's reservation. Lacking inherent authority, a tribe may exercise regulatory authority over such non-Indian lands only by express congressional delegation. The court today determines that S 301(d)(2)(B) of the Clean Air Act, 42 U.S.C. S 7601(d)(2)(B), expressly delegates to tribes--contingent upon approval by the EPA Administrator--authority to enforce the Clean Air Act on nonmembers' lands within a reservation. Finding no such express delegation in S 301(d)(2)(B), I dissent from Part II.A of the opinion for the court.
 
 I. Background
 
 96
 In State of Montana v. United States, 450 U.S. 544 (1981), the Crow tribe had sought to regulate nonmembers' hunting and fishing upon lands owned in fee by the State of Montana but lying within the boundaries of the Crow reservation. The Supreme Court, unanimous upon this point, held that a tribe generally lacks authority to regulate the conduct of nonmembers upon lands owned in fee by nonmembers ("fee lands");of the two exceptions the Court noted, the only one arguably relevant here is that "[a] tribe may ... retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566. Absent such a threat or effect, tribal regulation of fee lands within a reservation requires an "express congressional delegation." Id. at 564.
 
 
 97
 The two provisions of the Clean Air Act relevant to the question of tribal authority to enforce the Act on fee lands were added by S 107 of the 1990 Amendments, Pub. L. No. 101-549, 104 Stat. 2399, 2464. Section 301(d) of the Act, 42 U.S.C. S 7601(d), provides in relevant part:
 
 
 98
 (1) Subject to the provisions of paragraph (2), the Administrator ... is authorized to treat Indian tribes as States under this chapter ...
 
 
 99
 (2) The Administrator shall promulgate regulations ...specifying those provisions of this chapter for which it is appropriate to treat Indian tribes as States. Such treatment shall be authorized only if
 
 
 100
 (A) the Indian tribe has a governing body carrying out substantial governmental duties and powers;
 
 
 101
 (B) the functions to be exercised by the Indian tribe pertain to the management and protection of air re-sources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction; and
 
 
 102
 (C) the Indian tribe is reasonably expected to be capable, in the judgment of the Administrator, of carrying out the functions to be exercised in a manner consistent with the terms and purposesof this chapter and all applicable regulations
 
 
 103
 Section 110(o) of the Act, 42 U.S.C. S 7410(o), provides in its entirety:
 
 
 104
 If an Indian tribe submits an implementation plan to the Administrator pursuant to section [301(d), above], the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section [301(d)(2)]. When such plan becomes effective in accordance with the regulations promulgated under section [301(d)], the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.
 
 
 105
 The EPA's Tribal Authority Rule (TAR) allows a tribe (subject to approval by the Administrator of the EPA) to enforce the Clean Air Act on all land within the boundaries of a reservation without having to demonstrate its inherent authority over all such land. Under the clear rule of Montana, however, a tribe lacks inherent sovereign authority to regulate fee lands (and rights of way, see Strate v. A-1 Contractors, 520 U.S. 438, 456 (1997)) within a reservation except under the aforementioned exception announced in that case. Therefore, the TAR must be set aside as contrary to law unless the 1990 Amendments expressly delegate to tribes authority over fee lands and rights of way within a reservation. Upon that starting point for analysis the parties, the court, and I agree.
 
 
 106
 The EPA claims to find a delegation of authority in S 301(d)(2)(B) of the Clean Air Act. In evaluating this claim, the court is to accord no deference to the EPA's interpretation of that section because Montana requires an "express congressional delegation" in order to expand tribal authority. In other words, the EPA cannot prevail merely by demonstrating that its interpretation of § 301(d)(2)(B) is reasonable; the agency's interpretation must be correct if the TAR is to stand. Therefore, although we are reviewing an EPA rulemaking, on this issue the focal point for our inquiry is not the EPA's interpretation but the statute itself. Upon this methodological point, too, all agree.
 
 II. Analysis
 
 107
 With these agreed upon principles in mind, it seems to me clear that the 1990 Amendments do contain an express delegation of authority over fee lands and rights of way--but not in S 301(d), which governs tribal enforcement of all Clean Air Act programs specified by the Administrator. Rather, the delegation is in S 110(o), which governs only tribal implementation plans (TIPs). Because the specific delegatory text in S 110(o) is significant to my conclusion that S 301(d) is not a delegation, I consider S 110(o) first.
 
 
 108
 A. Section 110(o) and the "Notwithstanding" Proviso
 
 
 109
 The petitioners' convoluted argument to the contrary notwithstanding, S 110(o) is self-evidently an express congressional delegation of authority to enforce TIPs on fee lands and rights of way within a reservation: "the [TIP] shall become applicable to all areas ... located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation." The same "notwithstanding" proviso has been a feature in the only two cases in which the Supreme Court has found an express delegation of authority to tribes. In United States v. Mazurie, 419 U.S. 544 (1975), and in Rice v. Rehner, 463 U.S. 713 (1983), the Court found an express delegation of authority over fee lands within a reservation based upon two statutory provisions: 18 U.S.C. § 1161, which authorizesthe tribes to enact ordinances regulating liquor in "Indian country"; and 18 U.S.C. S 1151, which defines "Indian country" to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." See Rice, 463 U.S. at 715 & n.1 ("Congress has delegated authority ... in Indian country [as defined in] 18 U.S.C. S 1151"); see also Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation, 492 U.S. 408, 428 (1989) (citing 18 U.S.C. SS 1151 and 1161 together as an express congressional delegation of authority over fee lands).*
 
 B. Section 301(d)
 
 110
 The express congressional delegation just identified in S 110(o) cannot by itself support the TAR, however: Because the TAR allows a tribe to enforce all applicable Clean Air Act programs--rather than just the TIP--on nonmember lands within its reservation, the EPA must demonstrate that S 301(d) likewise contains an express congressional delegation of authority.
 
 
 111
 The EPA argues the following text distilled from S 301(d) contains an express delegation to tribes of authority to regulate fee lands within a reservation:
 
 
 112
 [T]he Administrator ... is authorized to treat Indian tribes as States.... Such treatment shall be authorized only if ... the functions to be exercised by the Indian tribe pertain to the management and protection of air resources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction.
 
 
 113
 42 U.S.C. S 7601(d)(1)-(d)(2)(B) (emphasis added). The gist of the agency's argument, which the court accepts, is that the Congress expressly delegated authority over all lands within a reservation by linking "within the exterior boundaries of the reservation" disjunctively to "other areas within the tribe's jurisdiction." For the following reasons, I do not agree.
 
 
 114
 As the petitioners emphasize, when one reads the relevant sentence as a whole--rather than focusing solely upon the last phrase--one sees that, rather than expressing a delegation of authority over fee lands and rights-of-way within a reservation, the sentence by its terms merely lays down a precondition to the Administrator's treating a tribe as a state. Even more certainly, there is no way to read the phrase deemed crucial by the court ("within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction") as an express delegation of authority.
 
 
 115
 One important indication that the Congress did not intend this phrase as an express delegation is that it used the Courttested "notwithstanding" proviso in S 110(o) but not in S 301(d)(2)(B). Sections 110(o) and 301(d)(2)(B) were enacted at the same time, in the same section of the same bill, so the different phrasing should not be thought just an artifact of legislative haphazar dry. I do not believe that the Congress, obviously aware that it could enlarge tribal authority over nonmember lands only through an express delegation, would include the formulaic"notwithstanding" proviso--the gold
 
 
 116
 standard for such delegations--in the narrower of the two sections, and then use an obscure and never-before-attempted formulation to accomplish the same result in the broader of the two sections. Further, the court's interpretation of S 301(d)(2)(B) renders the "notwithstanding" proviso in S 110(o) surplusage--a point the court euphemistically acknowledges, Slip Op. at 1295 ("a reinforcement of tribes' ... [S 301(d)(2)(B) authority] to implement TIPs in reservation land"). If S 301(d)(2)(B) is so clear as to constitute an express congressional delegation, it is difficult to believe that the Congress would "reinforce" this point in a narrower provision enacted at the same time as and expressly cross referencing S 301(d).[1]
 
 
 117
 Finding an express congressional delegation in S 301(d) is made even more difficult, as the petitioners contend, by the Congress's having deleted a literal delegation to tribes that was included in the corresponding section of the bills by which the 1990 Amendments were first introduced in the House and the Senate: "the Administrator ... may delegate to [ ] tribes primary responsibility for assuring air quality and enforcement of air pollution control." H.R. 2323, 101st Cong. S 604, reprinted in 2 Legislative History of the Clean Air Act Amendments of 1990, at 4053, 4101 (1993) [hereinafter 1990 Leg. Hist.]; S. 1630, 101st Cong. § 111, reprinted in 5 1990 Leg. Hist. 9050, 9145. The Senate passed S. 1630 with this express delegation intact; the House, however, did not act upon H.R. 2323 but instead passed H.R. 3030, in which the delegation provision did not appear. See 2 1990 Leg. Hist. 1809, 1972-73 (House passage of S. 1630, amended in the nature of a substitution of H.R. 3030). The House version prevailed in conference, see id. at 478-79, so the 1990 Amendments as finally enacted into law do not contain this literal delegation provision. The court is of course correct that the Congress need not use the word "delegate" in order to effect an express delegation, Slip Op. at 1290; S 110(o) illustrates the point. That the Congress "specifically rejected language favorable to [EPA's] position," Slip Op. at 1289, however, is further evidence that the legislature did not mean to enact a delegation of authority. Indeed, to believe that the Congress meant S 301(d)(2)(B) to serve as a delegation, after it had included the "notwithstanding" proviso in the narrower S 110(o) and removed from S 301(d) a provision that expressly provided a delegation to tribes, would require one to believe the Congress was more interested in testing our interpretive acumen than in clearly expressing its will upon the important issue of tribal authority over nonmembers.
 
 
 118
 The court claims support for its contrary conclusion in the Congress having "moved from authorizing tribal regulation over the areas 'within the tribal government's jurisdiction' ... to a bifurcated classification of all areas within 'the exterior boundaries of the reservation' and 'other areas within the tribe's jurisdiction.' " Slip Op. at 12. Putting aside the question-begging interpolation of "all" into the quoted passage, Ithink the court misapprehends the significance of the phrase "within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction." As originally introduced, H.R. 3030 referred only to air resources "within the exterior boundaries of the reservation." 2 1990 Leg. Hist. 3737, 3853. The House Committee on Energy and Commerce without comment added the phrase "or other areas within the tribe's jurisdiction," id. at 3021, 3069, and as mentioned, the House version later prevailed in conference. The legislative record is silent about why the Committee added that phrase. The most straightforward interpretation of the addition is that the Committee wanted to ensure that the treatment of tribes as states extended beyond the reservation to non-contiguous areas of tribal authority, such as dependent Indian communities. This seems far more likely than that a House committee, with no discussion, inserted the phrase "or other areas within the tribe's jurisdiction" in order to turn a simple reference to reservations into a delegation of authority over non-Indian lands within reservations.
 
 
 119
 Finally, I cannot agree with the court that we should find an express congressional delegation of authority in S 301(d)(2)(B) in any part because the contrary reading "would result in a 'checkerboard' pattern of regulation within a reservation's boundaries that would be inconsistent with the purpose and provisions of the [Clean Air] Act." Slip Op. at 11-12. First, it is not at all clear that a "checkerboard" pattern--really a matter of certain fee lands remaining subject to State (or federal) rather than tribal authority, while surrounding areas go tribal--would result: a tribe remains free to demonstrate its inherent authority over any activity on fee lands that "threatens or has some direct effect on ... the health or welfare of the tribe," Montana, 450 U.S. at 566.Therefore, if a tribe does find itself without authority over certain fee lands for want of an express delegation, that is only because no activities on those fee lands threaten or directly affect the health or welfare of the tribe.
 
 
 120
 Second, tribal authority over less than all lands within the boundaries of a reservation is the logical result of the tribes' "diminished status as sovereigns," Montana, 450 U.S. at 565.The Montana rule on its face contemplates less than uniform authority within a reservation; unless an exception applies, the tribe cannot regulate a parcel owned by a nonmember even though it retains authority over the surrounding lands owned by the tribe. See, e.g., Brendale, 492 U.S. at 428 (White, J., for the Court in part and dissenting in part), 443, 445 (Stevens, J., for the Court in part and concurring in the judgment in part) (each affirming non-uniform zoning authority). While the Congress could have chosen to sweep away such non-uniformity in S 301(d), as it did in S 110(o), the court's evident sense that the Congress should have done so is no basis for reading an express delegation into the statute where the Congress has not written one[2].
 
 III. Conclusion
 
 121
 In my view, S 301(d)(2)(B) is not an express delegation of authority for Indian tribes to regulate the conduct of nonmembers on fee lands within the boundaries of a reservation. A tribe may be able, of course, to demonstrate its authority over such fee lands under the exception recognized in Montana. Without making such a showing, however, I do not believe the tribe may regulate the conduct of nonmembers on fee lands and rights-of-way except as provided by S 110(o). I
 
 
 122
 therefore respectfully dissent from Part II.A. of the opinion for the court.
 
 
 
 Notes:
 
 
 *
 In a dictum, the Brendale Court noted as a second example of an express congressional delegation of authority SS 518(e), (h)(1) of the Clean Water Act, 33 U.S.C. SS 1377(e), (h)(1), the latter of which, significantly, contains the notwithstanding clause so glaringly absent from § 301(d). 492 U.S. at 428. In terms that otherwise track S 301(d) of the Clean Air Act, S 518(e) provides for conditionally treating a tribe as a state with regard to water resources "within the borders of an Indian reservation," defined in S 518(h)(1) as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation." In spite of the Brendale dictum, the EPA has concluded S 518 is not an express congressional delegation of authority, see 56 Fed. Reg. 64,876, 64,880 (1991), but no court has yet resolved the issue.
 
 
 [1]
 The court suggests the Congress may well have intentionally avoided using the "notwithstanding" proviso in § 301(d) in response to the EPA's having interpreted § 518 of the Clean Water Act as not being a delegation. Slip Op. at 13. The EPA's interpretation of the CWA was not adopted, however, until December 1991, more than a year after enactment of the 1990 Amendments. See 56 Fed. Reg. 64,876, 64,880. I am not willing blithely to "assume that Congress was aware of," much less responded to, the EPA's mere proposal to adopt that interpretation. When the 1990 Amendments were enacted, the EPA's unexplained proposal was still subject to change in the light of public comments, and even if finally adopted would not receive deference from a reviewing court charged with determining whether the Congress had made an express delegation to tribes. In contrast, we know for a certainty that the Congress was aware of Brendale, in which the Supreme Court instanced CWA S 518(h)(1) as an express congressional delegation: That case had been decided in June 1989, and is cited in the Senate Report on an earlier version of the 1990 Amendments, see S. Rep. No. 101-228, at 79.
 
 
 [2]
 Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351 (1962) and Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976), cited by the court today, certainly do not counsel reading an express delegation into a statute in order to avoid non-uniform tribal authority within a reservation. In Seymour, the Court held that "an impractical pattern of checkerboard jurisdiction was avoided by the plain language of [18 U.S.C.] S 1151," namely, the "notwithstanding" proviso. 368 U.S. at 358. And in Moe, the Court determined that because the Congress had "repudiated" but never formally repealed S 6 of the General Allotment Act, 25 U.S. S 349, the court would read S 6 narrowly in order to avoid creating an inconsistency with later-enacted statutes. 425 U.S. at 477-79. Thus, the Court was merely "follow[ing] Congress' lead in this area." Id. at 479. So, too, where the Congress has expressly delegated authority, as in S 110(o), we should certainly give its command full rein; but where it has not, we should not undertake to do so for it.